Frederick WEISS, Plaintiff,

v.

Robert H. SWANSON, Jr., David S. Lee, Richard M. Moley, Thomas S. Volpe, Leo T. McCarthy, Lothar Maier, Paul Coghlan, David B. Bell, Robert C. Dobkin, Donald Paulus, Alexander McCann, Defendants,

and

Linear Technology Corporation, Nominal Defendant.

C.A. No. 2828–VCL.

Court of Chancery of Delaware.

Submitted: Nov. 28, 2007.
Decided: March 7, 2008.

Norman M. Monhait, Esquire, Jessica Zeldin, Esquire, Rosenthal Monhait & Goddess, P.A., Wilmington, DE; Thomas G. Shapiro, Esquire, Edward F. Haber, Esquire, Michelle H. Blauner, Esquire, Robert E. Ditzion, Esquire, Ian McLoughlin, Esquire, Shapiro Haber & Urmy, LLP, Boston, MA, for the Plaintiff.

William M. Lafferty, Esquire, John P. DiTomo, Esquire, Morris Nichols Arsht & Tunnell, LLP, Wilmington, DE; Douglas J. Clark, Esquire, Nicole M. Healy, Esquire, Cheryl W. Foung, Esquire, Dominique–Chantale Alepin, Esquire, Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, CA, for the Nominal Defendant.

David A. Jenkins, Esquire, Smith Katzenstein & Furlow, LLP, Wilmington, DE; Robert P. Haney, Jr., Esquire, Covington & Burling, LLP, New York City; Sonya D. Winner, Esquire, Tammy Albarrán, Esquire, Jason M. Zoladz, Esquire, Covington & Burling, LLP, San Francisco, CA, for the Individual Defendants.

## OPINION

LAMB, Vice Chancellor.

In this derivative action, the plaintiff challenges option grants made by directors pursuant to stockholder-approved option plans. According to the plaintiff, the board of directors adopted a policy of using material, inside information to time option grants, but never disclosed the practice. Specifically, the plaintiff alleges that the board of directors routinely granted options prior to quarterly earnings releases containing positive information, and after releases containing negative information. On this motion to dismiss for failure to adequately plead demand excusal and for failure to state a claim upon which relief can be granted, the court takes the particularized well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. Applying that standard, the court concludes that the complaint adequately pleads a claim of breach of fiduciary duty against a majority of the company's board of directors based on the alleged issuance and receipt of options not authorized by the company's plans. Therefore, the motion to dismiss will be denied.

### I.

#### A. *The Parties*

The plaintiff, Frederick Weiss, has been a stockholder of Linear Technology Corporation since January 12, 1996. Weiss brings this action derivatively on behalf of Linear, the nominal defendant. Linear was founded in 1981 as a manufacturer of high performance linear integrated circuits, including high performance amplifiers, voltage references, battery chargers, and RF signal conditioning circuits.

The individual defendants are certain former and current Linear directors and

officers. At the time the challenged option grants were approved, defendants Robert H. Swanson Jr.,[1] David S. Lee, Richard M. Moley, Thomas S. Volpe, and Leo T. McCarthy (collectively, the "Director Defendants") constituted Linear's board of directors. Defendant Lothar Maier became a director in September 2005.[2] McCarthy left the board in November 2006, and Linear has since had a five-person board. At all relevant times, Lee, Moley, Volpe, and McCarthy constituted the Compensation Committee. The five named officers who allegedly received challenged option grants are Paul Coghlan, David B. Bell, Robert C. Dobkin, Donald Paulus, and Alexander McCann (collectively, the "Officer Defendants").[3]

B. *Facts*

Weiss filed his first complaint on March 23, 2007, and filed an amended derivative complaint on August 10, 2007 in response to a motion to dismiss filed on May 5, 2007. The defendants filed the pending motion to dismiss on September 19, 2007.

In his complaint, Weiss challenges 22 option grants the company made between July 1996 and July 2005 pursuant to three stockholder-approved option plans: the 1988 Stock Option Plan, the 1996 Incentive Stock Option Plan, and the 2005 Equity Incentive Plan.[4] The plans set out the general terms by which options may be granted. Notably, the plans authorize the board of directors to approve grants made to directors. Thus, according to Weiss, the Director Defendants approved all option grants made to themselves.[5] Weiss also alleges that the plans authorize the Compensation Committee to approve option grants made to officers.

Under Linear's stockholder-approved option plans, the administrators are authorized to grant options as part of a compensation system designed to "attract and retain the best available personnel" and "to provide additional incentive to Employees, Directors, and Consultants."[6] Two types of options are authorized: incentive stock options designed to comply with section 422 of the Internal Revenue Code of 1986, and non-statutory stock options. All options Weiss challenges are non-statutory options. Paragraph 9 of the 1996 Plan provides:

> In the case of a Non-statutory Stock Option, the per Share exercise price shall be determined by the Administra-

1. In addition to serving as a board member, Swanson was also Linear's chief executive officer from April 1999 until January 2005.

2. Maier served as Linear's chief operating officer from 2000 to January 2005, and became Linear's chief executive officer in January 2005.

3. The Officer Defendants did not assert an absence of personal jurisdiction over them in their motion to dismiss. Therefore, they have waived any such defense and submitted themselves to the jurisdiction of this court. *See* Del. Ch. Ct. R. 12(h).

4. Although the complaint identifies three plans, the 1996 Plan is the one primarily at issue. The 2005 Equity Plan was not adopted by stockholders until November 2005, four months after the last challenged option grant was approved. *See infra* note 10. The 1988 Plan covers only the July 23, 1996 and October 16, 1996 option grants, *see id.*, because it was superceded by the 1996 Plan, which the stockholders approved in November 1996. Further, neither the 1988 Plan nor the 2005 Equity Plan are in the record before the court. Therefore, the court must accept Weiss's characterization of them as true. All references to a stockholder-approved option plan are to the 1996 Plan.

5. Because Maier became a director only after the last challenged option grant was authorized, he is alleged to have only received the option grants, not authorized them.

6. 1996 Plan ¶ 1.

tor. In the case of a Non-statutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Internal Revenue Code, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.[7]

Thus, under the plans, the directors had full discretion to grant "in the money" options by setting exercise prices lower than the fair market value of Linear's stock price on the date of grant. The plans also provide that "[t]he date of grant of an Option shall be, for all purposes, the date on which the Administrator makes the determination granting such Option, or such other later date as is determined by the Administrator."[8]

Weiss alleges that from July 1996 to June 2005, the directors granted options that violated the purposes, intent, spirit, and objectives of these plans. Specifically, Weiss alleges that the Director Defendants knew the company's quarterly earnings releases were highly anticipated by Linear investors, and that Linear's stock was dramatically affected by these announcements.[9] Weiss claims that the directors had advance knowledge of the contents of the quarterly earnings releases, and used this information to time each of the 22 challenged grants on terms favorable to the defendants.[10] According to the complaint, when the quarterly earnings release contained materially adverse information expected to drive down the market price of Linear's shares, the Director Defendants "bullet-dodged" the options, delaying their grant until after the release of the information. Conversely, when the quarterly earnings release contained material information expected to drive up the market price of Linear's shares, the Director Defendants allegedly "spring-loaded" the options, granting them just prior to the quarterly earnings release. Weiss also alleges that the Director Defendants never disclosed to stockholders that they timed option grants in this manner.

Weiss recognizes that granting and receiving spring-loaded and bullet-dodged

---

7. "Fair Market Value" is defined as the closing bid price for Linear's stock. Thus, the 1996 Plan requires options intended to qualify under section 162(m) of the Internal Revenue Code to have an exercise price equal to the closing price of Linear's stock on the date the options are granted. Under section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly compensated officers is tax deductible only if it is "performance-based," meaning it is given as an incentive for future performance, not as a reward for past performance. Options granted in the money allegedly do not meet this condition, and therefore are not eligible for treatment under section 162(m).

8. 1996 Plan ¶ 13.

9. In support of his allegations that the quarterly earnings releases had a material effect on Linear's stock price, Weiss cites to a 2006 report by Merrill Lynch comparing the annualized 20–day returns from the dates of Linear's management stock option grants with investor calendar year annual returns. Weiss contends that the Merrill Lynch report found that between 1997 and 2002, the defendants realized returns for their option grants that exceeded investor returns by an average of 396%.

10. Weiss identifies 40 earnings releases between 1996 and 2005, and alleges that public records indicate option grants occurred in connection with 28 of those releases. According to Weiss, 22 of those 28 grants were either "spring-loaded" or "bullet-dodged" in the manner described herein. The dates of the 22 grants are as follows: July 23, 1996, October 16, 1996, January 14, 1997, July 22, 1997, January 12, 1998, July 22, 1998, January 12, 1999, April 13, 1999, July 20, 1999, January 16, 2001, April 17, 2001, July 25, 2001, October 17, 2001, July 26, 2002, January 15, 2003, July 22, 2003, April 13, 2004, July 20, 2004, October 14, 2004, January 18, 2005, April 20, 2005, and July 27, 2005.

options might be an appropriate exercise of business judgment in some circumstances. However, he asserts the Director Defendants' policy of timing options as alleged in this case was inconsistent with the expectations of the stockholders who approved the plans. Therefore, Weiss reasons, the defendants breached their fiduciary duties by authorizing, receiving, or (by abdication of duty) permitting grants not authorized by the stockholders. Weiss also contends that this timing policy harmed the corporation by artificially lowering the exercise price of the options, causing the company to receive too little money when the options are eventually exercised.

Weiss further alleges that the Director Defendants breached their fiduciary duties by causing Linear to issue the 1996 Proxy Statement, the 1998 Proxy Statement, the 2000 Proxy Statement, and the 2005 Proxy Statement without disclosing material information—namely, that options had been spring-loaded and bullet-dodged. Finally, Weiss brings a waste claim against the Director Defendants, and a claim for unjust enrichment against all the defendants.

In response, the defendants assert that Weiss neither made demand nor adequately pleads reasons for demand excusal. The defendants also argue that the complaint fails to state a claim for breach of fiduciary duty. According to the defendants, the complaint is devoid of allegations that Linear's directors had material

inside knowledge, or acted with the intent to circumvent the restrictions contained in the plans, both necessary elements of a breach of duty claim premised on the grant of spring-loaded and bullet-dodged options. The Officer Defendants further argue that the complaint fails to state a claim against them because mere receipt of timed options does not represent a breach of fiduciary duty. Finally, the defendants argue that claims relating to 14 of the 22 grants are time-barred.

For the reasons set forth below, the defendants' motion to dismiss will be denied.

## II.

### A. Demand Is Excused

*Aronson v. Lewis* provides the test for whether demand is excused where a majority of the board of directors that would consider demand also made the challenged decision.[11] According to the complaint, the Compensation Committee—three of whom remain on Linear's board—and Swanson approved all of the option grants now challenged. Because all four of these individuals currently serve on Linear's five-person board, Weiss alleges that a majority of the board of directors to consider demand also made the decision to approve the challenged transactions. Therefore, the standard articulated in *Aronson* applies in this case.

---

11. See 473 A.2d 805, 814 (Del.1984); see also Ryan v. Gifford, 918 A.2d 341, 353 (Del.Ch. 2007); Conrad v. Blank, 940 A.2d 28, 36 (Del. Ch.2007). In Rales v. Blasband, 634 A.2d 927, 934 (Del.1993), the Delaware Supreme Court held that the Aronson test should not be applied where the board on which demand would be made did not make the business decision challenged in the litigation, a situation that arises in three main scenarios: (1) where the board made a business decision but a majority of the directors who made the decision has since been replaced; (2) where the claim at issue does not arise from a business decision of the board; and (3) when a board of a different company made the challenged business decision. According to Rales, in those situations, demand is excused if the well-pleaded allegations of the complaint give rise to a reasonable doubt that the board can exercise "its independent and disinterested business judgment in responding to a demand." Id. at 933–34.

■ Under the *Aronson* test, demand is futile and excused where, in light of the particularized facts alleged, a reasonable doubt is created that (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.[12] Demand is excused if a reasonable doubt exists as to either prong.[13]

■ The requirement of particularized facts means a "[p]laintiff's pleading burden [in the demand excused context] is ... more onerous than that required to withstand a Rule 12(b)(6) motion."[14] At this stage in the proceedings, the court considers only the well-pleaded allegations of the complaint,[15] the documents incorporated into the complaint by reference,[16] and judicially-noticed facts.[17] The court draws all reasonable inferences from the complaint's allegations in the plaintiff's favor.[18] However, "only well-pleaded allegations of fact must be accepted as true; conclusory allegations of fact or law not supported by allegations of specific facts may not be taken as true."[19]

Here, demand is excused for two reasons. First, the particularized allegations of the complaint, taken as true, support a reasonable doubt that the challenged decisions were the result of a valid exercise of business judgment. Second, all five directors to consider demand received at least some of the challenged option grants and are therefore interested.

1. *The Allegations In The Complaint Create A Reasonable Doubt That Approval Of The Option Grants Was A Valid Exercise Of Business Judgment*

■ Although the defendants are correct that compensation decisions are typically protected by the business judgment rule,[20] the rule applies to the directors' grant of options pursuant to a stockholder-approved plan only when the terms of the plan at issue are adhered to. Thus, as the court held in *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, allegations in a complaint rebut the business judgment rule where they support an inference that the directors intended to violate the terms of stockholder-approved option plans.[21] Notably, the *Tyson* court

12. See *Aronson*, 473 A.2d at 814–15; *see also Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).

13. See *Brehm*, 746 A.2d at 256.

14. *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991).

15. See, e.g., *Desimone v. Barrows*, 924 A.2d 908, 928 (Del.Ch.2007); *White v. Panic*, 783 A.2d 543, 547 (Del.2001).

16. See, e.g., *Desimone*, 924 A.2d at 928; *Albert v. Alex. Brown Mgt. Servs., Inc.*, No. 762, 2005 WL 1594085, at *12 (Del.Ch. June 29, 2005).

17. See *Desimone*, 924 A.2d at 928 (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del.2006)).

18. See, e.g., *id.*; *White*, 783 A.2d at 547 n. 5.

19. *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988).

20. See *In re 3COM Corp. S'holders Litig.*, No. 16721, 1999 WL 1009210, at *3 (Del.Ch. Oct. 25, 1999).

21. The *Tyson* court held that a claim of spring-loading or bullet-dodging rebutted the business judgment rule if (1) the plaintiff establishes that the challenged grants were given pursuant to an options plan, and (2) the plaintiff establishes that directors who approved the grants (a) possessed material non-public information soon to be released that would affect the company's share price, and (b) issued options with an intent to circumvent otherwise valid stockholder-approved restrictions upon the exercise price of the options. See 919 A.2d 563, 593 & n. 75 (Del.Ch. 2007) (hereinafter, "*Tyson I*").

also held that allegations such as those found in this complaint could support such an inference.

In *Tyson*, the plaintiff alleged that disinterested and independent members of the board breached their fiduciary duties when, pursuant to a stockholder-approved option plan, they granted spring-loaded options to the CEO of the company without disclosing that they had done so.[22] Rather, "[a]ll SEC disclosures revealed the stated strike price to be the market price on the day of the grant."[23] The directors did not deny that they had granted spring-loaded options, but responded that the plan allowed them to grant such options. Specifically, they argued the plan gave them great discretion in granting options-including the ability to grant options rewarding past performance,[24] and there was no explicit restriction against spring-loading in the plan.

The *Tyson* court denied relief to the directors on their motion for judgment on the pleadings. First, the court noted that "shareholders have a right to the full, unvarnished truth" in the area of executive compensation, and therefore directors, as fiduciaries, have a duty to disclose all material information when seeking stockholder approval of an option plan, or when disclosing an option grant.[25] Second, the court held that even though the plan gave the directors wide discretion in granting

options and did not explicitly prohibit spring-loading, the existence of the spring-loading scheme was material information the directors had a duty to disclose.[26] Because the record before the court created a reasonable inference that the directors had not made this disclosure, the court denied the defendants' motion. Importantly, the *Tyson* court further held that it could infer from this lack of disclosure that the grants themselves had not been made in good faith, *i.e.* the directors intended to make grants that violated the option plan.[27]

The *Tyson* court noted that it could have also reasonably inferred that the directors had made a business judgment that spring-loaded options neither harmed the company nor needed to be disclosed. However, on the defendants' motion for judgment on the pleadings, the court was obliged to give the "plaintiffs the benefit of every reasonable inference, not to give defendants the benefit of every doubt."[28] Therefore, the directors' decision to grant spring-loaded options was not entitled to the presumptions of the business judgment rule, at least at that stage of the proceedings.

This case is substantially similar to *Tyson*. There is no dispute that the challenged options were granted pursuant to stockholder-approved option plans. Further, according to the complaint, the Director Defendants had access to the quar-

22. See generally, *Tyson I*, 919 A.2d 563.

23. *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106, 2007 WL 2351071, at *4 (Del.Ch. Aug. 15, 2007) (hereinafter *"Tyson II"*).

24. For instance, the plan allowed the directors to set a below fair market value exercise price.

25. *Id.* at *4 & n. 18; *In re 3COM*, 1999 WL 1009210, at *5.

26. See *Tyson II*, 2007 WL 2351071, at *4 (holding that the nature of a spring-loading scheme "would constitute material information that the Tyson board of directors was obligated to disclose to investors ...").

27. See *id.* at *5; *see also Desimone*, 924 A.2d at 930 n. 80 (noting that spring-loading "exploit[s] an interstitial gap in a manner that clearly deprive[s] the stockholders of the bargain they thought they had").

28. *Tyson II*, 2007 WL 2351071, at *5.

terly earnings releases before they became public and knew that the releases materially affected Linear's stock price. In addition, the allegations in the complaint, taken as true, support an inference that the releases did in fact materially affect Linear's stock price; Weiss notes the date of each relevant release, and then identifies Linear's stock price in the days following each release. Reading these allegations in a light most favorable to Weiss, it appears from the complaint that Linear's stock price increased in the days following a positive announcement, and decreased after a negative one. Additionally, Weiss alleges that, with 22 of 28 grants made in conjunction with quarterly earnings releases, the Director Defendants approved grants before positive releases and after negative releases. These particularized allegations support an inference that the Director Defendants granted spring-loaded and bullet-dodged options.

■ Under the court's reasoning in *Tyson*, then, the remaining questions are whether this alleged practice of timing options through spring-loading and bullet-dodging is material information, and, if so, whether it was disclosed. In considering the materiality of the Director Defendants' alleged practice of timing options, it is important to note that this court has yet to consider the precise allegations presented here. *Tyson* considered only whether a practice of spring-loading is material infor-

mation, and this court has had no occasion to consider whether a practice of bullet-dodging is material information directors have a duty to disclose.[29] Taking Weiss's allegations in this case as true, it is reasonable to infer that stockholders would consider the practice of timing options described in the complaint to be important in deciding whether to approve the option plans or to reelect board members.[30] In other words, the well-pleaded allegations in the complaint support an inference that the Director Defendants' alleged practice of granting spring-loaded and bullet-dodged options in conjunction with earnings releases was material information. Under *Tyson*, because the allegations of the complaint support an inference that the Director Defendants never disclosed this practice in the plans themselves, subsequent proxy statements, or SEC filings describing the option grants, the allegations in the complaint also give rise to an inference that the Director Defendants, in violation of their fiduciary duties, intended to circumvent the restrictions found in the plans.

It bears noting that, unlike Tyson's disclosures, Linear's disclosures do not affirmatively state that all options were granted with a fair market value strike price. Rather, based on the record properly before the court on this motion to dismiss, Linear's disclosures appear to be much

---

**29.** Although the court in *Desimone* did not discuss the materiality of a practice of bullet-dodging, it did opine that waiting "until after ... negative news is disclosed" to make "a discretionary grant of market-price options" is "the kind of situational business judgment, which traditional corporation law principles leave to disinterested directors." 924 A.2d at 945 (reasoning that "[i]t would be an odd compensation practice indeed to make a discretionary grant of market-price options when the board knows that the stock is actually worth less than the market price").

**30.** "Material facts are those facts for which 'there is a substantial likelihood that a reasonable person would consider [them] important in deciding how to vote.'" *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del.Ch.1999) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985)); *see also Frank v. Arnelle*, No. 15642, 1998 WL 668649, at *3 (Del.Ch. Sept. 16, 1998) (defining materiality as information "a reasonable stockholder would find ... has altered the 'total mix' of information available.").

more ambiguous about the options' strike prices.[31] Therefore, the inference of impropriety is somewhat weaker in this case than it was in *Tyson*.[32] Nonetheless, Weiss has alleged particularized facts creating a reasonable doubt that the option grants resulted from a valid exercise of business judgment, and demand will be excused.

The defendants maintain that the information contained in the earnings reports was immaterial, and therefore the directors could not have spring-loaded or bullet-dodged options. In support of their position, the defendants contend that the stock price appears to react to the quarterly earnings releases as predicted only because Weiss cherry-picked option grants to create the impression of a pattern of manipulation. Specifically, the defendants point out that Weiss only challenges grants made to officers and directors, not rank and file employees. The defendants also note that Linear's stock price actually fell after the two earnings releases Weiss characterizes as "positive,"[33] that Linear's stock rose a legally immaterial amount after six other releases,[34] offer up alternative explanations for why Linear's stock price changed after the earnings releases,[35] and argue that the April 13, 2004 and April 19, 2000 grants cannot be considered

because, as SEC filings show, the allegations surrounding them are inaccurate.[36]

These arguments do not justify a different result on the pending motion. The facts regarding Linear's option grants to non-executive employees are all taken from outside of the complaint and are not found in documents properly before the court. Weiss says as much in his complaint, alleging he has not challenged option grants made to rank and file employees because those grants were not disclosed in public records, and therefore he does not know how or when those options were granted. The defendants' argument with regard to non-executive employee grants is inappropriate at this time.

Further, the defendants' quibbling with how the earnings reports affected Linear's stock price, even assuming such quibbles to be true, does not help them. Taking the defendants' assertions as true—that the stock price actually went down after two of the allegedly "positive" earnings releases and that two other grants should not be considered because Weiss's allegations as to them are inaccurate—means Linear's stock price reacted as expected to 18 of 22 quarterly earnings releases, albeit in very small amounts as to six of those 18. These allegations are sufficient to support

---

31. For instance, the Compensation Committee Reports accompanying annual proxy statements state that the corporation retained the right to grant options that did not qualify for treatment under section 162(m), indicating grants may have been issued in the money, *i.e.*, with a below fair market value strike price.

32. The defendants also argue that this case is distinguishable from *Tyson* because the SEC has ceased its investigation of the company. However, the allegations in this case involve whether the directors have violated their fiduciary duties, not federal securities law. *See Tyson I*, 919 A.2d at 593. Therefore, it is

immaterial to this case that the SEC has ceased its investigation.

33. *See* Defs.' Rep. Br. 14.

34. Those grant dates are July 22, 2003 (.17% rise), October 12, 2004 (1% drop), January 18, 2005 (1.51% rise), July 20, 2004 (4.27% rise), July 22, 1997 (7.91% rise), and January 14, 1997 (8.38% rise). *See* Defs.' Op. Br. 25; Defs.' Rep. Br. 14.

35. *See* Defs.' Rep. Br. 15–16.

36. *See* Defs.' Op. Br. 26.

an inference that the earnings reports were material to investors.[37]

Perhaps evidence will come to light establishing that the directors had no idea or opinion as to the effect of the earnings releases on Linear's stock price, or that they reasonably relied on competent experts and advisors in determining grant dates. The defendants might also produce evidence establishing that Weiss's methodology for measuring the effect of the quarterly earnings releases on Linear's stock price is flawed, or that his characterizations of the quarterly earnings releases are incorrect. But those factual determinations are for another day, and, at this stage of the litigation, the court must draw all reasonable inferences in favor of Weiss.

The defendants next argue that the plans authorized spring-loading and bullet-dodging, and that descriptions of the option grants in SEC filings adequately disclosed the Director Defendants' policy of timing option grants with material, non-public information. Specifically, the defendants point to language in the plans stating option grants would be used "to attract and retain the best available personnel."[38] Citing the Chancellor's opening remarks in *In re Walt Disney Company Derivative Litigation*, the defendants further argue that requiring more explicit disclosure would unfairly apply modern notions of corporate governance to decades old conduct.[39] According to the defendants, this is especially so here since no SEC regulations required disclosure of spring-loading and bullet-dodging at the time the grants were made, and Delaware courts look to SEC regulations when determining what disclosures are required.

The language the defendants now identify as fulfilling their disclosure obligations is nearly identical to that the court rejected as insufficient in *Tyson*. There, the defendants argued that the plan itself disclosed the timing of option grants because "one of the stated purposes of the [Tyson option] Plan is to 'provide a means of obtaining, rewarding and retaining [ ] key personnel.' "[40] Noting that "shareholders

---

**37.** Weiss also points to the 2006 Merrill Lynch report in order to establish that the earnings reports were material, thereby enabling the defendants to time option grants. In response, the defendants raise several objections to the methodology of the report and its application to this case. The court is unsure that such an attack is even appropriate on a motion to dismiss because the defendants' arguments seem to require reference to expert testimony. Still, the court's determination that the quarterly earnings releases are material is based not so much on the amount by which the market moved in response to each release, but the remarkable consistency with which the market allegedly responded to the quarterly earnings releases as expected. Thus, even without the Merrill Lynch report, the complaint supports an inference that the quarterly earnings releases were material. Therefore, the court need not consider defendants' argument regarding the Merrill Lynch report at this time.

**38.** The defendants cite similar language found in the Compensation Committee Reports accompanying annual proxy statements that states "the Committee believes that its primary responsibility is to provide a compensation program that will attract, retain and reward the executive talent necessary to the Company's success." As noted, the Compensation Committee Reports also contain what might be the clearest indication that the plans contemplated grants for past performance rather than future performance. They state that the corporation retained the right to grant options that did not qualify for treatment under section 162(m).

**39.** *See* Defs.' Op. Br. 15 (citing *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 698 (Del.Ch.2005), *aff'd*, 906 A.2d 27 (2006)).

**40.** *See* Outside Directors' Reply Brief in Support of their Motion for Judgment on the Pleadings on Count III of the Consolidated Complaint at 7 n. 6, *In re Tyson*, No. 1106 (Del.Ch. June 29, 2007).

have a right to the full, unvarnished truth" in the area of executive compensation,[41] the *Tyson* court rejected the sufficiency of the defendants' "sparse" disclosures[42] and "bare formalism concealed by a poverty of communication."[43]

In addition, the cases to which the defendants cite are inapposite. Those cases establish only that Delaware courts defer to SEC regulations regarding the technicalities of disclosures. For example, in *Lewis v. Vogelstein*,[44] the plaintiff asserted that a proxy statement seeking approval of an option plan was materially incomplete and misleading because it did not include an estimated present value of the option grants the directors might receive under the plan. The plaintiff asserted that the corporate directors had a duty to disclose the present value of future options as estimated by some option-pricing formula, such as the Black–Scholes option-pricing model. The *Lewis* court, recognizing that federal securities law did not require such disclosure, dismissed the plaintiff's claim. Noting that "[s]ignificant doubt exists whether ... option-pricing models provide a sufficiently reliable estimate of the value of options," the court reasoned that it should defer to the SEC as to how option values should be disclosed because the question involved "technical judgments concerning what is feasible and helpful," not simply a "moral intuition that directors should be candid with shareholders."[45]

Similarly, in *Frank v. Arnelle*,[46] the plaintiff challenged a Dutch auction, alleging the offer circular disseminated to the stockholders omitted material facts. Specifically, the plaintiff alleged that on the weekend before the auction closed, a director decided to tender some of his shares. The company issued a press release disclosing this fact the following Monday morning. The plaintiff alleged that the corporation should have made disclosure through a supplemental mailing to stockholders rather than a press release. The *Frank* court rejected the plaintiff's claim, noting that "federal law establishes under what circumstances it is necessary to supplement the information in ... federal filings and, more significantly, the manner in which such supplemental disclosure is to be disseminated."[47] This deference was especially necessary where "the plaintiff has not alleged any malfeasance on the part of the defendants."[48]

Requiring disclosure of the policy of timing option grants alleged in this complaint, however, does not rest merely on technicalities. Nor does this case implicate the *Disney* court's warning against applying "21st century notions of best practices" to decades-old conduct.[49] Rather, as the *Tyson* court concluded, the obligation to disclose the policy of timing option grants alleged in this complaint arises simply from a "moral intuition ... that directors

41. *Tyson II*, 2007 WL 2351071, at *4 & n. 18.

42. *Id.* at *5.

43. *Id.* at *3.

44. 699 A.2d 327 (Del.Ch.1997).

45. *Id.* at 331–32.

46. 1998 WL 668649.

47. *Id.* at *7.

48. *Id.* at *8. In the defendants' final citation, *In re Wheelabrator Techs. Inc. S'holders Litig.*, No. 11495, 1990 WL 131351, at *7 (Del.Ch. Sept. 6, 1990), the court found that the plaintiffs had "not shown why Delaware law should be held to require ... disclosure" because the information was immaterial, not because of a lack of federal law requiring disclosure.

49. 907 A.2d at 698.

should be candid with shareholders"[50] and this court's well-established definition of materiality.[51] Such a determination is within the proper domain of fiduciary duty law, and requires reference only to well-established standards of fiduciary duty. The allegations in the complaint support an inference that the Director Defendants failed to meet those standards, and therefore a reasonable inference can be drawn that they intended to circumvent restrictions implied in the plans.

The defendants contend that the court should not draw this inference for three reasons. First, they argue that at the time the grants were made, they did not believe those grants violated the restrictions in the plans, in large part because the SEC did not prohibit spring-loaded or bullet-dodged options. Stated positively, the argument is that the Director Defendants made a business judgment that the option grants complied with the terms, spirit, and intent of the plans. Second, the Director Defendants argue they lacked an intent to circumvent the restrictions of the plans because they did not have a direct financial motive to do so. Third, the defendants maintain that all of the options had long vesting periods, meaning the grantee could not exercise the options until several years after they were granted. Thus, the defendants argue, the challenged option grants did not reward the grantees for past performance, but, rather, continued to provide the grantee an incentive to maintain and increase Linear's stock price. As a result, the defendants conclude, the option grants complied with the plans' underlying intent.

The defendants' first two arguments are inappropriate for resolution on a motion to dismiss. These arguments are asserted more by way of affirmative defenses based on facts outside the complaint than as challenges to the sufficiency of the complaint. Future proceedings may establish that the Director Defendants, reasonably relying on competent counsel, decided that the plans authorized spring-loading and bullet-dodging and that these practices were properly disclosed. There may also be evidence that the Director Defendants had valid business reasons for approving each option grant in the manner they did. But these are questions of fact unsuitable for determination on a motion to dismiss.

In addition, the *Tyson* court already rejected the defendants' argument regarding vesting as a basis for granting the defendants' motion for judgment on the pleadings. As that court noted, "recipients of options are generally unable to benefit financially from [options] until a vesting period has elapsed, and thus an option's value to an executive or employee is of less immediate value than an equivalent grant of cash."[52] Thus, the *Tyson* court recognized that grants of in the money options can act as incentives for managers. Nonetheless, the *Tyson* court held that such grants may represent a breach of fiduciary duty if they are not disclosed to stockholders.[53] As discussed above, the allegations support an inference that the Director Defendants did not disclose the practices challenged in this case, and therefore the complaint must be read as giving rise to a reasonable inference that the directors intended to circumvent the restrictions of the plans. Accordingly, the complaint, taken as true, supports a reasonable doubt

**50.** *Lewis,* 699 A.2d at 332.

**51.** *See, e.g., O'Reilly,* 745 A.2d at 916 (quoting *Rosenblatt,* 493 A.2d at 944); *see also Frank,* 1998 WL 668649, at *3.

**52.** *Tyson I,* 919 A.2d at 592 n. 75.

**53.** *See id.*

that the decision to award the challenged options was the result of a valid exercise of business judgment, and demand will be excused.

### 2. *The Allegations In The Complaint Create A Reasonable Doubt That A Majority Of The Board To Consider Demand Is Disinterested*

In the alternative, demand will be excused because all five directors to consider demand received at least some of the challenged option grants and are not disinterested. The defendants correctly cite two cases for the general rule that demand is not excused simply because directors receive compensation from the company or an executive of the company.[54] But those cases do not address the slightly different question presented here—whether demand is excused where the challenged decision is the directors' decision to award themselves compensation, and there are allegations supporting an inference that the decision breached fiduciary duties. This situation is governed by the court's ruling in *Conrad v. Blank*, which held:

> [Directors who have received challenged options] have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits. This creates an unacceptable conflict that restricts them from evaluating the litigation independently.[55]

Therefore, the board is interested and demand is excused on that independent ground.

The court notes one final reason to doubt whether the directors could properly consider demand. Linear's 2006 Form 10–K indicates that the company has conducted an internal investigation into its "historical option-granting practices" and concluded that there was "no evidence of fraud or misconduct of any kind in the Company's practices in granting stock options." Given the contrary inferences arising from the complaint, "the court questions how it is that the interests of the corporation are not, or at least do not appear to be, adverse to the interests of the individual defendants."[56]

### B. *Failure To State A Claim*

#### 1. *Breach Of Fiduciary Duty*

The defendants argue that the complaint fails to state a breach of fiduciary duty claim under Court of Chancery Rule 12(b)(6) as to the Director Defendants for approving the challenged grants. "[W]here [the] plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson*, that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)."[57] Therefore, the complaint states a claim against the Director Defendants for breach of fiduciary duty as a result of approving the challenged option grants.

The defendants also contend that the complaint fails to state a claim against the Director Defendants for breach of fiduciary duty in connection with improper disclosures. The defendants note that under Delaware law, improper disclosure leads to

---

54. *See A.R. DeMarco Enter., Inc. v. Ocean Spray Cranberries, Inc.*, No. 19133, 2002 WL 31820970, at *5 (Del.Ch. Dec. 4, 2002); *White v. Panic*, 793 A.2d 356, 366 (Del.Ch.2000), aff'd, 783 A.2d 543, 551 n. 24 (Del.2001).

55. *Conrad*, 940 A.2d at 38.

56. *Id.* at 37.

57. *Ryan*, 918 A.2d at 357.

a breach of fiduciary duty only when the disclosure is made in connection with a request for stockholder action.[58] According to the defendants, Weiss has not identified any specific stockholder action connected to the disclosures.

This argument clearly lacks merit. Weiss alleges that the Director Defendants omitted that they would grant spring-loaded and bullet-dodged options from both the 1996 proxy statement seeking stockholder approval of the 1996 option plan and the 1998 proxy statement seeking stockholder approval of an amendment to the 1996 plan increasing the number of shares of common stock reserved for issuance. Weiss also alleges that in connection with proxy solicitations seeking reelection to Linear's board of directors, the Director Defendants made statements giving the impression that they had implemented the option plans in accordance with the plans' terms, when in fact they implemented a policy of timing grants that was not authorized under the plans. Therefore, Weiss has adequately pleaded a claim against the Director Defendants for breach of fiduciary duty based upon improper disclosures.[59]

■ Weiss has also stated a claim against the Officer Defendants and Maier for receiving the challenged grants. Here, the complaint alleges that these individuals knew or, absent recklessness, should have known that the grants violated the stockholder-approved option plans. Under the liberal pleading standards of this court, this knowledge may be averred generally.[60] Such allegations, taken as true, support an inference that the Officer Defendants and Maier, via their receipt of the options, breached their fiduciary duties.[61]

### 2. Unjust Enrichment

The defendants further argue that Weiss has not stated a claim for unjust enrichment as to any defendant because Weiss has not explained how the alleged timing of option grants enriched grantees. This argument is wholly without merit. Weiss posits that timing option grants ensures that the exercise price of a grantee's option is lower than it otherwise would be. Thus, upon exercise of the option, the grantee receives more value, and the company less, than he should.

■ The defendants argue that they have not been unjustly enriched as to options that remain unexercised. However, as the court stated in *Ryan*, this fact

---

**58.** *See O'Reilly,* 745 A.2d at 920, 926, 927.

**59.** *See id.*

**60.** *See* Del. Ch. Ct. R. 9. As this court said in *IOTEX Communications, Inc. v. Defries:*

[W]here pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.

No. 15817, 1998 WL 914265, at *4 (Del.Ch. Dec. 21, 1998). The allegations in this complaint meet this standard. The Officer Defendants were aware of the dates on which they received option grants, and the quarterly earnings reports are alleged to have been "a focus of attention at Linear." Compl. ¶ 158. Construing all reasonable inferences to be drawn from the complaint in a light most favorable to Weiss, these allegations support an inference that the Officer Defendants knew or, absent recklessness, should have known that the option grants they received were spring-loaded or bullet-dodged.

**61.** The defendants object that Bell, McCann, and Paulus joined Linear only after many of the grants were made, and these individuals cannot be liable for breaches of duty that occurred before they joined the company. This is, of course, true, but it is no reason to dismiss the claims against them *in toto.*

alone does not lead to a conclusion that there is no reasonably conceivable set of circumstances under which the defendants might be unjustly enriched. Indeed, the defendants retain something of value—the challenged options—at the expense of the corporation. Nothing suggests that the defendants are prevented from exercising their options once they fully vest. Thus, "one can imagine a situation where [the defendants] exercise[ ] the options and benefit[ ] from the low exercise price."[62] Moreover, even if the defendants do not exercise any options at all, the court may still be able to fashion an appropriate remedy, such as repricing or rescinding the options.[63] Thus, the motion to dismiss the unjust enrichment claim will be denied.

### 3. *Waste*

Waste has been defined as follows:

Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky.[64]

In *Desimone*, Vice Chancellor Strine stated that stock option manipulation could lead to a claim for waste.[65]

 The defendants argue that Weiss has failed to plead a claim for waste because he does not allege that the defendants should not have received any options, only that the option grants were excessive by some unarticulated amount. The defendants mischaracterize Weiss's allegations. Weiss alleges that the defendants should not have received any of the timed options at all, and that the grants were approved without any valid corporate purpose.[66]

 The court recognizes that a claim for waste must meet "an extreme test, very rarely satisfied by shareholder plaintiff."[67] However, in this case, the court cannot conclude that there is no reasonably conceivable set of facts under which Weiss could prove a claim of waste. Therefore, Weiss has pleaded a claim for waste.

### C. *The Claims Are Timely*

The defendants contend that the statute of limitations of 10 *Del. C.* § 8106 bars those claims based on option grants that occurred more than three years before the complaint was filed. Further, the defendants assert that tolling doctrines do not apply to this case because the information necessary to put Weiss on notice of his claim was publicly available.

 A statute of limitations at law does not bind the Court of Chancery, a court of equity, with respect to purely

---

**62.** *Ryan,* 918 A.2d at 361.

**63.** *See id.*

**64.** *Brehm,* 746 A.2d at 263 (emphasis omitted).

**65.** 924 A.2d at 916.

**66.** *See* Compl. ¶ 202.

**67.** *Zupnick v. Goizueta,* 698 A.2d 384, 387 (Del.Ch.1997).

equitable claims.[68] However, in a case such as this, where the plaintiff seeks legal relief or this court has concurrent jurisdiction, the court applies the statute of limitations by analogy.[69] Typically, the statute of limitations begins to run when the cause of action accrues, not when the injury is discovered.[70] Still, even "in actions seeking damages or essentially legal relief"[71] this court "does not strictly apply statutes of limitations."[72] Rather, the running of the limitations period can be tolled in certain limited circumstances.[73]

■ Weiss asserts two separate theories to support a tolling of the statute of limitations in this case: fraudulent concealment and equitable tolling. Each of these doctrines permits tolling of the limitations period where "the facts underlying a claim [are] so hidden that a reasonable plaintiff could not timely discover them."[74] Weiss alleges that his claims are timely because the statute of limitations was tolled until at least after 2005.

■ Fraudulent concealment requires an affirmative act of concealment or "actual artifice" by a defendant that prevents a plaintiff from gaining knowledge of the facts.[75] Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[76] Underlying this doctrine is the idea that even an attentive and diligent investor may rely, in complete propriety, upon the good faith of fiduciaries.[77] If the limitations period is tolled under either of these theories, it is only tolled until a plaintiff discovers, or by exercising reasonable diligence should have discovered, his injury.[78] Thus, the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, *i.e.* on inquiry notice.[79] It is Weiss's burden to plead specific facts to demonstrate that the statute of limitations was, in fact, tolled and that the Linear stockholders were not on inquiry notice of the derivative claims before August 10, 2004, the date three years before his complaint was filed.[80]

---

68. *See Adams v. Jankouskas*, 452 A.2d 148, 157 (Del.1982).

69. *See In re Dean Witter P'ship Litig.*, No. 14816, 1998 WL 442456, at *3 (Del.Ch. July 17, 1998), *aff'd without opinion*, 725 A.2d 441 (Del.1999); *see also Franklin Balance Sheet Inv. Fund v. Crowley*, No. 888, 2006 WL 3095952, at *6 (Del.Ch. Oct. 19, 2006) (citing *Orloff v. Shulman*, No. 852, 2005 WL 3272355, at *10 (Del.Ch. Nov. 23, 2005)).

70. *See Dean Witter*, 1998 WL 442456, at *4.

71. *Yaw v. Talley*, No. 12882, 1994 WL 89019, at *5 (Del.Ch. Mar. 2, 1994).

72. *Franklin Balance Sheet*, 2006 WL 3095952, at *6 (citing *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del.1996)).

73. *See Albert*, 2005 WL 1594085, at *12 (citing *Wal–Mart Stores v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del.2004) (per curiam)).

74. *Id.*, at *18; *Dean Witter*, 1998 WL 442456, at *5.

75. *Tyson I*, 919 A.2d at 585; *Albert*, 2005 WL 1594085, at *19; *Dean Witter*, 1998 WL 442456, at *5.

76. *See Tyson I*, 919 A.2d at 585; *Albert*, 2005 WL 1594085, at *19; *Dean Witter*, 1998 WL 442456, at *6.

77. *See Tyson I*, 919 A.2d at 585; *Dean Witter*, 1998 WL 442456, at *6 (quoting *Kahn v. Seaboard Corp.*, 625 A.2d 269, 275–76 (Del.Ch.1993)).

78. *See Dean Witter*, 1998 WL 442456 at *6.

79. *See id.*

80. *See Tyson I*, 919 A.2d at 585; *Brady v. Pettinaro Enter.*, 870 A.2d 513, 524–25 (Del.Ch.2005); *Dean Witter*, 1998 WL 442456 at *6.

█ Assuming the facts in the complaint to be true, Weiss has established that the doctrine of equitable tolling applies, and he was not on inquiry notice of injury before August 10, 2004. Weiss alleges that the Director Defendants knowingly granted spring-loaded and bullet-dodged options to executives and themselves while never publicly disclosing those practices. Weiss was "entitled to rely upon the competence and good faith of those protecting [his] interests," including with regard to administration of the plans.[81] Therefore, the application of equitable tolling is appropriate.[82]

█ It would be inappropriate to infer, as the defendants argue, that Weiss was on inquiry notice of his claims simply because he could have pieced together the alleged practice of timing option grants from publicly available information. Here, unlike the cases the defendants cite, the information needed to put Weiss on notice of his claims did not appear in one document.[83] In order to discover the alleged pattern of timing, Weiss would have had to cull through the company's Form 4s each time they were filed,[84] compare the grant dates of the options with the timing of the quarterly earnings releases, and then conduct a statistical analysis in order to uncover the alleged malfeasance.[85] Such an investigation is beyond "reasonable" diligence.[86]

In later proceedings, the defendants will have the opportunity to present evidence to show that Weiss was, in fact, on inquiry notice. For instance, the defendants "might establish that financial analysts, institutional investors, or academic research-

81. *Tyson I*, 919 A.2d at 590–91.

82. Fraudulent concealment might also apply in this case if Weiss can show an intent on the Director Defendants' part to deceive stockholders. However, as noted, the inference of such intent in this case is weaker than in *Tyson* because, unlike in *Tyson*, Linear's disclosures do not affirmatively state that all options have been granted with a fair market value strike price. Without this affirmative act of concealment, it is more difficult to say on the record presently before the court that fraudulent concealment is appropriate. Because equitable tolling applies, however, the court need not address the issue further.

83. *See Dean Witter*, 1998 WL 442456, at *8 (rejecting a tolling argument where all the information necessary to put the plaintiff on notice of his claim was found in one annual report); *Official Comm. of Unsecured Creditors*, No. 20228, 2004 WL 1949290, at *8 (Del.Ch. Aug. 24, 2004) (dismissing a claim as time-barred where the allegedly wrongful payment of a bonus to a CEO was disclosed in a proxy statement); *In re USACAFES, L.P. Litig.*, No. 11146, 1993 WL 18769, at *3–6 (Del.Ch. Jan. 21, 1993) (rejecting a tolling argument where the challenged compensation practices were fully disclosed in the company's Form 10–Ks).

84. The court may consider these documents on a motion to dismiss. *See Tyson I*, 919 A.2d at 585 (stating that on a motion to dismiss an action as untimely, the court may consider two types of evidence outside the complaint without converting the motion to dismiss into a motion for summary judgment: "(a) documents expressly referred to and relied upon in the complaint itself, and (b) documents that are required by law to be filed, and are actually filed, with federal or state officials").

85. This is true even if, as the defendants alleged, the quarterly earnings releases and the company's Form 4s were publicly released at roughly the same time. There is nothing in the Form 4s giving any indication of a connection to the quarterly earnings release, or vice versa. Thus, taking the allegations of the complaint as true, nothing in one document would give Weiss a reason to look at the other.

86. *See id.* at 590 (tolling the statute of limitations where, to discover the wrongdoing, the plaintiff would have to "sift through a proxy statement, on the one hand, and a year's worth of press clippings and other filings, on the other"); *see also Ryan*, 918 A.2d at 360.

ers had published research suggesting that [Linear's] directors favorably timed option grants long before the consolidated complaint was filed."[87]

## IV.

For the foregoing reasons, the defendants' motion to dismiss is DENIED. IT IS SO ORDERED.