# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| STUART SCHOENMANN, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 2021-0326-SG |
| ANGELIQUE IRVIN, | ) | |
| Defendant, | ) | |
| and | ) | |
| CLEAR ALIGN, LLC, | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 10, 2022
Date Decided: June 2, 2022

Stacey A. Scrivani, of STEVENS & LEE, P.C., Wilmington, Delaware, *Attorney for Plaintiff Stuart Schoenmann.*

Joanna J. Cline, Christopher B. Chuff, and Emily L. Wheatley, of TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware, *Attorneys for Defendant Angelique Irvin and Nominal Defendant Clear Align, LLC.*

**GLASSCOCK, Vice Chancellor**

This unusual case starts with a not-uncommon scenario. A Defendant controller and (at times) sole manager of a limited liability company engaged in what are alleged to be self-dealing actions and transactions, in violation of her contractually provided duty of loyalty. Among the claims are a direct claim asserting distributions made to the controller but not to the other members, in violation of the company's LLC Agreement, and a derivative claim asserting, rather opaquely, that a number of self-payments authorized by the controller violated her duty of loyalty to the LLC.

What is unusual here is the uncertainty caused by the fluid nature of the board of managers. The controller—holder of the majority of the membership interests— has the contractual authority to add or remove managers, as well as to determine the number of managers, which she is alleged to have wielded frequently, as her own self-interest dictated. The defendant controller raises, for instance, failure to establish demand futility, pointing to managers she put in as replacement managers and noticed to members on the eve of (and, inferentially, in light of) a motion to dismiss in this action. Moreover, the distributions at issue largely took place outside the analogous contractual statute of limitations. While the Plaintiff maintains the doctrine of equitable tolling is applicable given the controller's status as a fiduciary, the defendant controller counters with the fact that the Plaintiff was *himself*, at certain times, a manager of the LLC, and that as a fiduciary he must be charged with

1

knowledge of the improper distributions. Per the Defendants, the Plaintiff is in not position, therefore, to avail himself of equitable tolling.

I consider this oddity, below. One of the Plaintiff's causes of action invokes the covenant of good faith and fair dealing, which I find unwarranted under the LLC Agreement at issue. A second relies on a reading of the LLC Agreement—as to the required number of managers—that I find unsupported by the language of that document. Otherwise, I find at this plaintiff-friendly stage that demand is excused, permitting consideration of the derivative breach of duty claim. Further, with respect to the direct claim of improper distributions, I find that equitable tolling is at least sufficiently invoked to allow that claim to go forward until creation of a record. The Defendants' motion to dismiss, accordingly, is denied in part and granted in part. My reasoning follows a statement of the facts.

## I. BACKGROUND

The instant lawsuit deals with both direct and derivative claims pled against a limited liability company and its founder, Angelique Irvin. The Plaintiff, Stuart Schoenmann, was previously on the board of managers (the "Board") of the limited liability company, called Clear Align (sometimes referred to as the "Company"). Following his removal from the Board, he filed a books and records demand under 18 Delaware Code Section 305 as a member of Clear Align. The books and records demand (the "Demand") did not yield helpful information, in Schoenmann's view,

2

and he believed the current Company Board was not making timely attempts to provide him with current information. He ultimately determined to bring the instant suit against Irvin and the Company rather than to continue his requests for books and records.

The claims Schoenmann has advanced are pled as follows: two direct claims against Irvin, one for breach of the implied covenant of good faith and fair dealing in connection with the discharge of managers, and one for breach of contract relating to distributions to be paid by the Company, which were allegedly not made *pro rata* as required by the LLC Agreement; and two derivative claims pled on behalf of the Company against Irvin, one for breach of contract for the Company's alleged failure to maintain three Managers on the Board at all times and one for breach of fiduciary duty, presumably for self-dealing. Though the claims sound similar facially, they are predicated upon separate factual bases.

The case is before me on a motion to dismiss. The Defendants ask me to dismiss all of the claims, believing Schoenmann to have failed to plead demand futility with respect to the two derivative claims, and that the claims against Irvin fail under Rule 12(b)(6). The Defendants also argue that the derivative breach of contract claim fails to state a claim.

I turn now to an exposition of the facts.

*A. Factual Overview[1]*

## 1. The Parties and Relevant Non-Parties

Plaintiff Stuart Schoenmann is a member of Clear Align and, per the Complaint, has been since 2014.[2] He was also previously a Manager of Clear Align, originally appointed in July 2015.[3]

Defendant Angelique Irvin is the President and CEO of Clear Align, and has been since the Company's formation in 2004.[4] She is also a Manager of the Company and its majority member.[5]

Nominal Defendant Clear Align is a Delaware limited liability company in the technology sector.[6] Clear Align's operating agreement (the "LLC Agreement") provides for a Board of Managers (defined above as "Board") that manages "[t]he business and affairs of the Company . . . except as otherwise expressly provided in this Agreement."[7]

A description of the relevant non-parties is complicated by the fact that the Complaint alleges two different Boards of Managers. One of the Boards of

---

[1] Unless otherwise specified, the facts in this section are drawn from the Complaint. Verified Am. Compl., Dkt. No. 6 [hereinafter "Compl."]. This section is reflective of the Complaint, and I consider the facts to be true as pled in the Complaint, in accordance with the applicable standard on a motion to dismiss. This section therefore does not constitute formal findings of fact.

[2] *Id.* ¶ 8.

[3] *See id.* ¶ 178.

[4] *Id.* ¶ 9.

[5] *Id.* ¶¶ 1, 48, 55.

[6] *Id.* ¶ 10. I refer to Clear Align and Irvin together as "Defendants" in this Memorandum Opinion, despite Clear Align's status as a nominal defendant, in concert with the parties' papers.

[7] *Id.* at Ex. C, § 6.1(b)(i).

Managers described the Plaintiff believes to be the current Board[8] based on his demand for books and records, and he originally pled demand futility with respect to this Board.[9]  That Board (referred to as the "Original Demand Board") consists of Irvin,  Gregory Bell, Chief Operating Officer of the Company,[10] and Scott Custer, a consultant for the Company.[11]

Schoenmann made his original Demand on May 7, 2019.[12]  When documents were not forthcoming, he filed a books and records action on July 16, 2019.[13]  The original complaint was filed on April 16, 2021,[14] but it was subsequently amended (such later filing, the "Complaint").[15]  Per the Complaint, on June 4, 2021, "within half an hour of filing the bare bones motion to dismiss . . . Irvin emailed Schoenmann for the first time a Member Consent purportedly signed on January 29, 2021 and purporting to remove Bell and Custer from the Board and adding Lodish and Jed Dunbar."[16]   I refer to this purported consent as the "2021 Consent" throughout.  Leonard Lodish is a Clear Align investor.[17]  The Complaint does not

---

[8] *Id.* ¶ 213.
[9] *See* Verified Compl. for Breach of Fiduciary Duties ¶¶ 209–45, Dkt. No. 1.
[10] Compl. ¶¶ 213, 220–21.
[11] *Id.*
[12] *Id.* ¶¶ 11, 14.
[13] *See Schoenmann v. Clear Align, LLC*, C.A. No. 2019-0544-SG, Verified Compl. for Inspection of Books and Rs., Dkt. No. 1.
[14] Verified Compl. for Breach of Fiduciary Duties, Dkt. No. 1.
[15] *See* Compl.
[16] *Id.* ¶ 214.
[17] *Id.* ¶ 24.

plead additional facts about Dunbar. This second purported Board of Managers, composed of Lodish, Dunbar, and Irvin, is referred to herein as the "Purported Current Board."

Other relevant non-parties include David Noteware, a prior Manager of Clear Align originally appointed in 2009,[18] and Robert Irvin, Defendant Irvin's husband.[19]

Schoenmann and Noteware were removed from the Board in April 2019.[20]

### 2. Clear Align's Pertinent Agreements

Two main agreements are referred to throughout the Complaint: an Employment Agreement (the "Employment Agreement") purportedly between Irvin and the Company, and the LLC Agreement of the Company.

The LLC Agreement outlines the composition of the Board, a provision relied on in the derivative breach of contract cause of action against Irvin for failure to maintain a full Board of Managers. That provision reads:

> (i) The number of Managers shall be one (1) until such time as the Members holding a majority of the Voting Rights determine to increase such number, and such Manager(s) shall be elected (including election following removal, resignation or death) by the affirmative vote of the Members holding a majority of the Voting Rights. Unless so determined otherwise, the Manager shall be Angelique Irvin.

---

[18] *Id.* ¶ 162.
[19] *Id.* ¶ 33.
[20] *Id.* ¶ 181 (identifying the date of removal as April 4, 2019); *id.* ¶¶ 194–95 (identifying the termination as taking place "[t]he very next day" after April 4, *i.e.*, April 5, 2019).

6

...

(iii) The Members that are entitled to elect a Manager may at any time remove (and replace) with or without cause any such Manager pursuant to (c)(i) above. A Member who removes a Manager shall promptly provide notice to the other Members of such removal and of the replacement for such Manager. [21]

The Complaint pleads that Irvin is the sole member holding a majority of the voting rights referenced in the LLC Agreement, purportedly effectively giving her the ability to expand or decrease the Board at will.[22] The Plaintiff challenges this interpretation in his direct claim against Irvin for breach of the implied covenant of good faith and fair dealing.[23] Irvin was the sole Manager until 2009.[24]

The LLC Agreement also includes requirements for any distributions made by Clear Align.[25] Distributions are to be made "to the extent available and deemed appropriate by the Board of Managers in its sole discretion."[26] When the Board of Managers authorizes a distribution, those distributions "shall be made *pro rata* to the Members in accordance with their Percentage Interests at such times and in such amounts as the Board of Managers shall determine."[27]

---

[21] *Id.* at Ex. C, § 6.1(c) [such Exhibit hereinafter "LLC Ag."].
[22] *Id.* ¶¶ 48–49.
[23] *Id.* ¶¶ 289–93.
[24] *Id.* ¶ 62.
[25] *Id.* ¶ 51.
[26] LLC Ag., § 4.1(a).
[27] *Id.*

The LLC Agreement also states specifically that Managers and officers of the Company owe both the members and the Company duties of loyalty and due care per Delaware law.[28]

The Employment Agreement between Irvin and the Company is also indirectly at issue. In 2006, Irvin signed a resolution authorizing the Company to enter into an employment agreement with her while she was the sole Manager.[29] The agreement is signed on behalf of the Company by her husband, despite the fact that he did not hold a position with the Company.[30]

The Employment Agreement provides Irvin with an annual base salary of $180,000, and contemplates that the salary will be reviewed yearly by the Board in accordance with performance review policies.[31] As noted above, no one else joined the Board until 2009, so any review from 2006 until 2009 was conducted solely by Irvin.[32] The Employment Agreement also allows for reimbursement for "reasonable expenses *related to Irvin's employment* . . . commensurate with that authorized for senior level executives."[33]

---

[28] *Id.* § 6.5.
[29] Compl. ¶ 55.
[30] *Id.* ¶ 56.
[31] *Id.* ¶¶ 59–60. The Plaintiff also points out that the Employment Agreement was necessarily the product of self-dealing as Irvin was the only Board Manager at that time and was therefore negotiating "with herself." *Id.* ¶ 58.
[32] *Id.* ¶¶ 62–63.
[33] *Id.* ¶ 64 (emphasis added).

### 3. Schoenmann and Noteware Investigate Irvin's Alleged Disloyal Acts

In 2018, the Board consisted of Irvin, Schoenmann, and Noteware.[34] At that time, Irvin spoke to Schoenmann and Noteware about increasing her compensation.[35] As part of a review of Irvin's compensation, Irvin told Noteware and Schoenmann that she had used the Company to pay her personal income taxes for years.[36] This admission prompted Schoenmann and Noteware to look more deeply into the financials of the Company.[37] As they conducted a deeper review, Schoenmann and Noteware spoke with various individuals at the Company who brought financial but also other types of concerns about Irvin to their attention.[38]

Schoenmann and Noteware scheduled a meeting with Irvin to suggest an independent investigation into the various concerns.[39] Some of these concerns are outlined below.

---

[34] *See, e.g.*, *id.* ¶ 182 (identifying mid-2018 as the time Irvin asked Schoenmann and Noteware about increasing her compensation); *id.* ¶¶ 194–95 (demonstrating Schoenmann and Noteware's terminations from the Board in April 2019). The Company's inconsistent recognition of Noteware as a Manager is discussed *infra*.

[35] *Id.* ¶ 182.

[36] *Id.* ¶ 184.

[37] *Id.* ¶ 185.

[38] *Id.* ¶¶ 185, 188.

[39] *Id.* ¶ 189.

### a. Personal Benefits Reaped by Irvin

The majority of the concerns regarding personal benefits Irvin received from the Company are financial in nature, though certain other allegations are made.[40] Of primary importance, Irvin paid herself distributions for tax years 2013, 2014, 2015, and 2016, years when no other members received distributions.[41] Irvin also paid herself *and other members* distributions for tax years 2017 and 2018, though it is unclear whether those distributions were paid *pro rata* with the other members' distributions.[42]

As mentioned above, Irvin caused the Company to pay her personal tax returns.[43] She also executed resolutions authorizing the Company to purchase a company car for "traveling employees for sales and business development purposes" in 2008, when she was the only Manager of the Board.[44] The Complaint alleges Irvin in fact purchased herself *two* company cars.[45] The Company paid for the gas, insurance, and maintenance on both such cars, in addition to the maintenance expenses for her husband's personal car.[46] She also failed to keep track of mileage

---

[40] These include allegations that Irvin required employees to babysit her children and allegations of sexual harassment of male employees by Irvin. *See id.* ¶¶ 118–29.
[41] *Id.* ¶¶ 94–101.
[42] *Id.* ¶¶ 102–07.
[43] *Id.* ¶ 184.
[44] *Id.* ¶ 73.
[45] *Id.* ¶ 78.
[46] *Id.* ¶¶ 80–81.

used for personal use as opposed to business use, despite the Company's finance department's requests to do so.[47]

Per the Plaintiff, Irvin and her husband also used Company funds for a host of personal expenses, including tolls, groceries, alcohol, clothing, toys, videos, gardening supplies, haircuts, pharmaceuticals, cell phones, personal travel, and meals.[48] Expense reports were not provided to the Company for these items.[49]

### b. Inconsistencies in Corporate Records

The Complaint also pleads a number of troubling allegations regarding Clear Align's corporate records and Defendant Irvin's hand in either falsifying or inconsistently keeping such records.

For example, and most innocently, Board records are evidently inconsistent as to Noteware's service as a Manager. He was elected in April 2009,[50] but minutes from a meeting held in March 2010 (concerning a Company acquisition) reflects Irvin as the singular Manager.[51] Noteware then attended a Board meeting just nine days later, and is reflected in the records as a Board attendee.[52] Board records *also* show a meeting in March 2011, held with only Irvin's attendance as the "Sole

---

[47] *Id.* ¶ 82.
[48] *Id.* ¶ 89.
[49] *Id.* ¶ 90.
[50] *Id.* ¶ 162.
[51] *Id.* ¶ 164.
[52] *Id.* ¶ 165.

Manager," and purportedly approving the very same acquisition from the March 2010 minutes.[53]

In January 2014, Irvin "held a meeting with herself to retroactively remove Noteware from the Board as of" March 1, 2011.[54]  Per the Complaint, Noteware never received notice of his purported removal from the Board.[55]

Then, in July 2015, Irvin expanded the Board to make Schoenmann a Manager.[56]  Meeting minutes from the July 22, 2015 meeting indicate that Noteware was evidently re-elected to the Board around the same time.[57]

Despite Schoenmann and Noteware's positions as Managers, Irvin held a special Board meeting on April 1, 2019, with herself, which approved a lease in excess of $2 million.[58]

The Board consisted of Irvin, Schoenmann, and Noteware until the latter two were removed from the Board in April 2019.[59]

### c. Irvin's Alleged History of Forgery

Schoenmann pleads a number of historical alleged forgeries perpetrated by Irvin.  While it is not necessary to relate each of these in detail, they are informative

---

[53] *Id.* ¶ 166.
[54] *Id.* ¶ 172.
[55] *Id.* ¶ 173.
[56] *Id.* ¶ 178.
[57] *See id.* ¶ 179 ("The minutes . . . indicate that the Board now consisted of Noteware (apparently again) and Schoenmann.").
[58] *Id.* ¶ 181.
[59] *Id.*

of what the Plaintiff suggests is a pattern of behavior by Irvin.[60] Schoenmann pleads that Irvin allegedly submitted a forged independent contractor agreement to the Internal Revenue Service in connection with a dispute over a former employee's tax status in 2017.[61] The Complaint states that the former employee in question believes his signature was forged.[62]

Similarly, the Complaint alleges a Board resolution containing a forgery of Manager Noteware's signature.[63] Noteware has submitted an affidavit in connection with the Complaint that states the signature in question is not his.[64]

Finally, the Complaint alleges that Irvin backdated Clear Align's former CFO's employment agreement in connection with a different litigation.[65] That litigation, initiated by the Company, sued to prevent the former CFO from breaching a noncompete, but attached in support only a partially executed employment agreement.[66] After partial execution was raised as a defense, Irvin produced a fully executed copy.[67] The suggestion is this employment agreement was signed and backdated by Irvin.

---

[60] *See, e.g., id.* ¶ 130.
[61] *See id.* ¶¶ 131–43.
[62] *Id.* ¶ 137.
[63] *Id.* ¶¶ 157–60.
[64] *See id.* at Ex. D.
[65] *Id.* ¶¶ 144–53. The Complaint alleges the backdating in a heading prior to paragraph 144 but fails to include it in a paragraph. *See generally id.*
[66] *Id.* ¶¶ 147–48.
[67] *Id.* ¶¶ 148–53.

## 4. The Demand, The Lawsuit, and the Purported Change in Board

After Noteware and Schoenmann undertook their review of Irvin's conduct and recommended an internal investigation be commenced, Irvin terminated both Noteware and Schoenmann from their positions on the Board and instructed them not to speak with Company employees.[68]

As the only remaining Manager on the Board, Irvin then raised her salary from $180,000 to $250,000, and requested that the CFO make a $1,800,000 payment to Irvin for deferred compensation.[69] The CFO refused and has since left the Company.[70]

Following his removal from the Board, on May 7, 2019, Schoenmann delivered the Demand for certain Company books and records, requesting 41 categories of documents.[71] The Company was not forthcoming in providing books and records; the Complaint alleges "delay, document manufacturing and . . . likely document destruction."[72]

In support of the document manufacturing, Schoenmann points to an email sent by Irvin four days after receiving the Demand.[73] That email, sent to the Company's outside accounting firm, blamed the Company's prior Chief Financial

---

[68] *Id.* ¶ 195.
[69] *Id.* ¶¶ 196, 198.
[70] *Id.* ¶¶ 199–200.
[71] *Id.* ¶¶ 11, 14.
[72] *Id.* ¶ 17.
[73] *Id.* ¶ 204.

Officer for "poor paperwork" and the payment of Irvin's personal expenses without her knowledge or approval.[74] Other documents failed to include metadata.[75]

Schoenmann followed up by filing suit to force production of the requested documents.[76] The Company still failed to produce documents responsive to Schoenmann's demand.[77] Clear Align apparently said "it produced all the documents it had" in certain categories that were demonstrably lacking.[78] For example, though Irvin had benefited from bonuses and back pay, Clear Align did not produce any documents demonstrating Company approval of bonuses or back pay, but responded that it had produced all the pertinent documents.[79] Similarly, the Company did not produce any Company policies relating to performance review or expense reimbursement in connection with the Demand, though such policies were referenced in Irvin's Employment Agreement.[80]

Schoenmann ultimately determined to stop pursuing his books and records claims in favor of pursuing this lawsuit.[81]

---

[74] *Id.*
[75] *Id.* ¶¶ 206–09.
[76] *Id.* ¶ 18.
[77] *Id.* ¶¶ 19–21.
[78] *Id.* ¶ 31.
[79] *Id.*
[80] *See id.* ¶¶ 61, 65.
[81] *Id.* ¶ 42.

## a. Demand Futility With Respect to the Original Demand Board

Again, the original complaint in this action was filed on April 16, 2021.[82] The Complaint asserts that the pertinent Board at the time of the original complaint's filing was the Original Demand Board (Irvin, Bell, and Custer),[83] but as discussed above, on June 4, 2021, after the initiation of this action, Clear Align circulated a consent purporting to change the Board's composition as of January 29, 2021.[84] The Complaint was subsequently amended and addresses demand futility with respect to both Boards.[85]

The Defendants concede Irvin's lack of impartiality in their opening brief.[86] The arguments the Plaintiff makes with respect to Bell and Custer are similar. Each is an employee or consultant of the Company and therefore receives compensation from the Company.[87] Thus, the Complaint alleges, neither can be expected to exercise his independent business judgment "without being influenced by the adverse personal consequences" that might result from such a decision.[88]

Bell and Custer were also on the Board when Schoenmann was pursuing his Demand. He therefore pleads that Bell and Custer have "already demonstrated" their

---

[82] Verified Compl. for Breach of Fiduciary Duties, Dkt. No. 1.
[83] *See supra* notes 10–11 and accompanying text.
[84] Compl. ¶ 214.
[85] *See generally* Compl.
[86] *See* Defs.' Opening Br. Supp. Mot. to Dismiss Verified Am. Compl. 40, Dkt. No. 11 [hereinafter "OB"].
[87] Compl. ¶ 225.
[88] *Id.* ¶ 223.

inability to act independently because they did not engage in an analysis of Irvin's compensation, which had been promised as part of the Demand investigation.[89] No such analysis was ever undertaken.[90] The Plaintiff also provides a second example of Bell and Custer's failure to act independently. Irvin, on behalf of the Board, offered a "limited buyout" to Company members and unit holders in November 2020.[91] Following a review of his Schedule K-1 for tax year 2020 received from the Company, the Plaintiff noticed that there was no change in his percentage ownership following the alleged buyout; after inquiry, he discovered that the Company did not have the financial ability to go through with any buyouts and "ultimately did not honor any buyout offer."[92] Schoenmann pleads this is evidence of Bell and Custer's inability to act independently and as required by their fiduciary duties.[93]

   b. Demand Futility With Respect to the Purported Current Board

  The Purported Current Board consists of Irvin, Lodish, and Dunbar.[94] No specific facts are pled with respect to Dunbar solely; the case against him is entirely inferential.[95] The Plaintiff has pled facts that he argues demonstrate Lodish's lack

---

[89] *Id.* ¶¶ 226–28.
[90] *Id.* ¶ 228.
[91] *Id.* ¶ 232.
[92] *Id.* ¶¶ 235–37.
[93] *Id.* ¶ 238.
[94] *See supra* note 16 and accompanying text.
[95] *See generally* Compl.

17

of independence. For example, Lodish received from Irvin in exchange for "no consideration" a 7.4% membership interest in the Company in 2004.[96] In 2006, Lodish received a "special bonus" consisting of 9700 units in the event the Company was sold, again for no consideration.[97]

For his part, in 2019 Lodish wrote a letter (the "Lodish Letter") that expresses his opinion that it was appropriate for Irvin to increase her compensation and her husband's compensation "[i]n the absence of a Board of Directors."[98] The Complaint characterizes the Lodish Letter as a "prior blessing of Irvin's bad acts" and therefore concludes that Lodish cannot independently evaluate a litigation demand regarding those same acts.[99] Notably, despite the statement that the Lodish Letter was made in the absence of a Board, the letter was authored on June 18, 2019, at which time Custer and Bell were Managers.[100]

### B. Procedural History

The procedural history here is mercifully brief. This plenary action was filed on April 16, 2021.[101] The complaint was amended, as discussed above, on July 13, 2021.[102] The Defendants moved to dismiss in July 2021, and, following briefing, I

---

[96] *Id.* ¶ 272.
[97] *Id.* ¶ 273.
[98] *Id.* ¶¶ 210, 211, 275. The Complaint quotes this language. I assume the Lodish Letter itself makes the error of referring to the Board as a Board of Directors (rather than Managers).
[99] *Id.* ¶ 279.
[100] *Id.* ¶ 211.
[101] Verified Compl. for Breach of Fiduciary Duties, Dkt. No. 1.
[102] Compl.

held oral argument on the motion to dismiss.[103]   The parties submitted supplemental briefing on the issue of equitable tolling; at the conclusion of that briefing I considered the matter fully submitted.[104]

## II. ANALYSIS

The motion to dismiss here is predicated in part upon failure to establish demand futility under Rule 23.1[105] and in part upon failure to state a claim under Rule 12(b)(6).  The applicable standard of review for the latter entitles the Plaintiff to have all well-pled factual allegations accepted as true and to receive the benefit of all reasonable inferences.[106]  The motion to dismiss should only be granted if the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[107]

The Plaintiff did not make a demand upon the Company, and the Complaint pleads that demand upon the Company would have been futile.[108]  Rule 23.1 requires

---

[103] *See, e.g.*, Defs. Angelique Irvin and Clear Align, LLC's Mot. to Dismiss Verified Am. Compl., Dkt. No. 8; OB; Pl.'s Answering Br. to Defs.' Mot to Dismiss Verified Am. Compl., Dkt. No. 15 [hereinafter "AB"]; Reply Br. Supp. Defs.' Mot. to Dismiss Verified Am. Compl., Dkt. No. 17 [hereinafter "RB"]; Tr. of 12.1.21 Oral Arg. on Defs.' Mot. to Dismiss, Dkt. No. 20 [hereinafter "Oral Arg."].

[104] Letter Br. to Sam Glasscock III Re: Equitable Tolling, Dkt. No. 21; Defs. Angelique Irvin and Clear Align, LLC's Suppl. Letter Br. to Sam Glasscock III Regarding Equitable Tolling, Dkt. No. 22; Reply Br. Re: Equitable Tolling, Dkt. No. 23.

[105] The text of the rule explicitly applies to limited liability companies as "unincorporated association[s]."  *See* Ct. Ch. R. 23.1(a), (d).

[106] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011) (citation omitted).

[107] *Id.*

[108] Compl. ¶¶ 212–16.

19

that pleading with respect to demand futility "comply with stringent requirements of factual particularity."[109] The Plaintiff remains entitled to all reasonable factual inferences that "logically flow" from the particularized facts alleged.[110] Demand is futile if a majority of the directors could not exercise independent and disinterested judgment regarding a demand.[111]

Following *Zuckerberg,* the test for demand futility is as follows, assessed on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand,
>
> (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand, and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[112]

---

[109] *See In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) (quoting *Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, 2002 WL 31926608, at *7 (Del. Ch. Dec. 20, 2002)).

[110] *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

[111] *See United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 877 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

[112] *Id.* at 890.

I address the direct claims first before undertaking the demand futility analysis. Because I find that demand was futile, I then proceed to an analysis of the derivative claims.

*A. The Direct Claims Against Irvin*

1. The Breach of Contract Claim for Failure to Make *Pro Rata* Distributions

Count 1 of the Complaint asks me to find that Irvin has breached the LLC Agreement by paying non-*pro rata* distributions to herself for a number of years.[113] The Defendants have attacked this count on various grounds depending on the subject year. One subset of years, it is argued, cannot be the subject of any viable cause of action because the statute of limitations has run. The second subset purportedly fails because of a failure to state a claim.

I first address the statute of limitations defense, raised in opposition to a subset of the distribution claims for tax years predating 2017. This court of equity applies the legal statute of limitation—for breach of contract, three years—by analogy. The Court will dismiss such stale claims based on laches.[114] The Plaintiff maintains, however, that the statute of limitations was tolled here, in equity.

---

[113] Compl. ¶¶ 283–88.
[114] *Erisman v. Zaitsev*, 2021 WL 6134034, at *12 (Del. Ch. Dec. 29, 2021) (citing *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013)).

### a. The Tax Years 2014, 2015, and 2016 Distributions and Equitable Tolling

The LLC Agreement requires distributions, when made in the Managers' discretion, to be paid on a pro rata basis:

> Distributions . . . shall be made *pro rata* to the Members in accordance with their Percentage Interests at such times and in such amounts as the Board of Managers shall determine and to the extent available and deemed appropriate by the Board of Managers in its sole discretion.[115]

The Plaintiff pleads that Irvin made non-*pro rata* distributions—to herself—in tax years 2013, 2014, 2015, and 2016.[116]

The Defendants argue that the statute of limitations has run on claims as to distributions improperly made in tax years 2014, 2015, and 2016.[117] The analogous statute of limitations expires after three years.[118] Because the payments for each of the applicable tax years were made in the *following* year, the challenged tax payments occurred in 2015, 2016, and 2017. The statute would have thus run as to these claims in 2018, 2019, and 2020, respectively. The distributions for tax years 2017 and 2018 are not challenged as running afoul of the statute of limitations.

---

[115] LLC Ag., § 4.1(a).

[116] *See supra* note 41 and accompanying text. The Plaintiff clarifies in his answering brief that he is not seeking relief for tax year 2013, as he was not yet a member, but that this information is provided as to tax year 2013 in support of the alleged pattern. AB 17.

[117] *See* OB 18–20.

[118] *See, e.g.*, *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *1 (Del. Ch. Jan. 12, 2015).

This Complaint was filed in 2021,[119] so the statute of limitations defense is at least facially valid. Where necessary, the plaintiff bears the burden to plead facts that demonstrate the applicability of an exception to the statute of limitations.[120] The answering briefing put forward tolling as a defense,[121] and I invited supplemental briefing on the question of equitable tolling at oral argument.[122]

Equitable tolling stops the statute of limitations from running in three circumstances: (1) where the defendant has fraudulently concealed important facts; (2) where an injury was "inherently unknowable" such that discovery of its existence "is a practical impossibility"; and (3) where a plaintiff "reasonably relies on the competence and good faith of a fiduciary" who is alleged to have engaged in wrongful self-dealing.[123] The Plaintiff suggests that this third scenario is implicated here.[124]

The reasoning underpinning this final circumstance is that "even an attentive and diligent investor may rely, in complete propriety upon the good faith of fiduciaries."[125] Where equitable tolling applies, the statute of limitations does not

---

[119] *See supra* note 101 and accompanying text.

[120] *HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*, 2017 WL 6209594, at *4 (Del. Ch. Dec. 8, 2017).

[121] AB 18.

[122] Oral Arg., at 41:16–42:10.

[123] *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *13 (Del. Ch. Aug. 22, 2016) (citation omitted).

[124] *See* Letter Br. to Sam Glasscock III Re: Equitable Tolling 2, Dkt. No. 21.

[125] *See, e.g.*, *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).

begin to run until the plaintiff is "*objectively* aware" of the pertinent facts.[126] But, there are exceptions to this exception to the statute of limitations: where a plaintiff possesses "contractual information rights," and therefore has the ability to enforce those rights summarily in court, "the plaintiff's challenge to demonstrate that he made reasonable inquiry is greater."[127]

The Defendants argue that Schoenmann has information rights as a Member under Section 10.7 of the LLC Agreement[128] and that he therefore must be held to this higher standard imposed on those who hold information rights.[129] They cite *Erisman v. Zaitsev* as fatal to the Plaintiff's argument.[130] The Plaintiff does not dispute his information rights in his reply letter brief but instead seeks to distinguish the caselaw.[131]

*Erisman v. Zaitsev* is a recent decision of this Court that addresses the question of equitable tolling where the plaintiffs had contractual information rights.[132] *Erisman* finds that multiple claims are time-barred, because although the plaintiffs could have made a timely inquiry into the various claims of wrongdoing using their

---

[126] *In re Am. Int'l Grp., Inc.,* 965 A.2d 763, 813 (Del. Ch. 2009) (emphasis in original) (citation omitted).
[127] *Erisman*, 2021 WL 6134034, at *13.
[128] LLC Ag., § 10.7(a).
[129] *Erisman*, 2021 WL 6134034, at *13.
[130] Defs. Angelique Irvin and Clear Align, LLC's Suppl. Letter Br. to Sam Glasscock III Regarding Equitable Tolling 4, Dkt. No. 22.
[131] Reply Br. Re: Equitable Tolling, Dkt. No. 23.
[132] *Erisman*, 2021 WL 6134034.

contractual information rights, they failed to do so.[133]   Thus, even though the *Erisman* defendants were fiduciaries, the plaintiffs were on inquiry notice because, via the information rights, "the information underlying plaintiff's claim [wa]s readily available."[134]

The Plaintiff attempts to distinguish *Erisman* on the basis that the "inquiry trigger" differs.[135]   The "inquiry trigger" in *Erisman*—that is, what caused the plaintiffs to seek books and records and ultimately to file a lawsuit—is not explicit in that opinion.  The Plaintiff argues that *Erisman*'s plaintiffs challenged a failure to make distributions generally,[136] which should have triggered their information rights.  Schoenmann, by comparison, was not on inquiry notice because he was unaware that an improper distribution was made only by the fiduciary to herself, until "Irvin admitted she was taking money from the Company to which she was not entitled."[137]  Only then, Schoenmann argues, he "knew or had reason to know of the facts constituting the wrong," and equitable tolling ceased.[138]

Schoenmann's supplemental briefing, however, does not engage with the fact that *he himself was a fiduciary*, not a mere investor relying upon the good faith of a

---

[133] *See id.* at *14.

[134] *Id.* (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998)).

[135] Reply Br. Re: Equitable Tolling 2, Dkt. No. 23.

[136] *Id.*

[137] *Id.* at 3.

[138] *Erisman*, 2021 WL 6134034, at *14 (quoting *Dean Witter*, 1998 WL 442456, at *6).

fiduciary.[139] The Complaint pleads that Schoenmann was added to the Board in July 2015.[140] Schoenmann therefore should have had visibility into Irvin's actions superior to that of a mere investor or member. The Defendants, unsurprisingly, urge this reading, arguing that because Schoenmann (1) had information rights as a member and (2) had the "practical ability" to oversee the Company's operations, he was on inquiry notice and equitable tolling cannot save Count 1 from partial dismissal.[141]

This conclusion, however, is belied by the extensive pleadings suggesting that this Board was not run as a well-functioning Board. It is not apparent to me that Schoenmann, despite his role as Manager, *actually did* have the "practical ability" to oversee the Company's operations.[142] The various single-Manager Board meetings reflected in the Company's minutes complicate matters.[143] It is a reasonable inference that, under the facts pled, Irvin manipulated the operations and composition of the Board in order to keep Schoenmann blind to her wrongdoing. This implicates both the fiduciary and fraud prongs of the equitable tolling doctrine.

Under the plaintiff-friendly inferences that attend a motion to dismiss, therefore, it is inappropriate to dismiss this cause of action on laches grounds. Of

---

[139] *See Weiss*, 948 A.2d at 451.
[140] Compl. ¶ 178.
[141] *See generally* Defs. Angelique Irvin and Clear Align, LLC's Suppl. Letter Br. to Sam Glasscock III Regarding Equitable Tolling 6, Dkt. No. 22.
[142] *Id.*
[143] *See, e.g., supra* notes 51, 53, 54 and accompanying text.

course, once the facts are developed, upon a motion for summary judgment or otherwise, the equitable tolling doctrine may prove inapplicable. At this stage, its application is reasonably conceivable.

### b. The Tax Year 2017 and 2018 Distributions

For tax years 2017 and 2018, the Company paid distributions, but the Complaint pleads that it is not clear whether those distributions were *pro rata*.[144]

The Defendants challenge this portion of Count I on the basis that it is speculative and does not plead *specific allegations of fact* that support the speculation.[145] I consider this argument seriously, but ultimately reject it. The pleading with respect to distributions for tax years 2017 and 2018 is frankly skimpy, reading as follows:

> 102. In 2018, Irvin received . . . distributions of $956,088 for tax year 2017, a year in which the Company made a profit.
>
> 103. For the first time in Company history, in 2018, members received distributions for the 2017 tax year.
>
> 104. It is unclear whether those distributions were made pro rata in accordance with their Percentage Interests.
>
> 105. For 2019, no Clear Align tax return or Schedule K-1 for Irvin was produced, but other Company records show Irvin took a member draw of $913,835.

---

[144] *See supra* note 42 and accompanying text.
[145] OB 20–21.

106. In 2019, another profitable year, members received distributions for 2018 tax year.

107. It is unclear whether those distributions were made pro rata in accordance with their Percentage Interests.[146]

But although it is true that a wealth of facts is not pled supporting these allegations, some of this may be due to Clear Align's inability (or, less generously, unwillingness) to produce documents. More importantly, the pattern of Irvin's behavior pled with respect to tax years 2013, 2014, 2015, and 2016 is factually suggestive that Irvin's behavior pertaining to tax years 2017 or 2018 was not aligned with her contractual duties. The pattern of behavior the Plaintiff has illuminated, the Company's inability or unwillingness to engage wholeheartedly in document production under a books-and-records demand, and the facts the Plaintiff has pled regarding Irvin are enough, if only barely, to state a claim here with respect to tax years 2017 and 2018. Under the notice pleading standard, Irvin is aware of the allegations, they are sufficiently pled such that Irvin can defend them, and the claim is reasonably conceivable.

Count 1 survives the motion to dismiss.

### 2. The Implied Covenant of Good Faith and Fair Dealing

Schoenmann has pled that Irvin breached the implied covenant of good faith and fair dealing by removing him from the Board for beginning the internal

---

[146] Compl. ¶¶ 102–07.

investigation with Noteware.[147] That removal, I note, was within her authority as the majority member under the Company's LLC Agreement.[148]

The implied covenant of good faith and fair dealing attaches to every contract.[149] Its operation requires a party to a contract to "'refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party . . . from receiving the fruits' of the bargain."[150] The Delaware Supreme Court has described the implied covenant as a "quasi-reformation" that should be applied only as a "rare and fact-intensive exercise."[151] "[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement," because it operates to handle "developments or contractual gaps that the asserting party pleads neither party anticipated."[152]

Here, the LLC Agreement expressly provides Irvin's ability, as the majority member of the Company, to remove a director with or without cause:

> (iii) The Members that are entitled to elect a Manager may at any time remove (and replace) with or without cause any such Manager pursuant to (c)(i) above. A Member who removes a Manager shall promptly provide notice to the other Members of such removal and of the replacement for such Manager. [153]

---

[147] *See id.* ¶ 291.
[148] *See* LLC Ag., § 6.1(c)(iii).
[149] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citation omitted).
[150] *Id.* (citation omitted).
[151] *Id.* (internal quotations omitted).
[152] *Nemec v. Shrader*, 991 A.2d 1120, 1125–26 (Del. 2010) (citations omitted).
[153] LLC Ag., at § 6.1(c).

There is no gap for the implied covenant to fill here, as Irvin's conduct is authorized by the LLC Agreement. Of course, Irvin is bound to use her authority consistent with the contractual fiduciary standard—by acting with loyalty and care.[154] That, to my mind, makes clear that there is no lacuna for the covenant to address. The breach of contract claim predicated upon the application of the implied covenant therefore fails, although Irvin's actions may support a breach of duty claim, via Count 4.

*B. The Derivative Claims Against Irvin*

I must resolve the question of demand futility before addressing the derivative claims substantively.[155] The demand futility analysis generally assesses the ability of the Board in place as of the date of the filing of a complaint.[156]

The Defendants have conceded that Irvin would not be capable of impartially assessing a demand.[157] Under either Board of Managers formulation, only one more Manager must lack independence before demand would be considered futile. All of the Plaintiff's allegations center on the third prong of *Zuckerberg*, pleading that each

---

[154] *See id.* § 6.5.
[155] Clear Align's LLC Agreement sets up a Board of Managers. *See supra* note 7 and accompanying text. Per our caselaw, "[i]f the drafters [of an LLC Agreement] have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law." *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016). I thus assess demand futility here in a manner analogous to that which I would employ if Clear Align were a corporation.
[156] *Park Emps. & Ret. Bd. Emps.' Annuity & Benefit Fund v. Smith*, 2016 WL 3223395, at *9 (Del. Ch. May 31, 2016) (citing *INFOUSA, Inc.*, 953 A.2d at 985).
[157] OB 40.

of the four possibly relevant managers lacks independence from Irvin and therefore could not impartially consider a demand.[158]

The inquiry into demand futility is complicated by the so-called 2021 Consent. The Plaintiff receives the benefit of the reasonable inferences at this stage. And the Plaintiff has pled a pattern of behavior by Irvin that is troubling—an apparent disregard both for corporate formalities and for ensuring the fidelity of corporate documentation. The inference the Plaintiff wishes me to draw is that, consistent with her past alleged behavior, Irvin backdated the 2021 Consent, which was actually formulated post-Complaint, to frustrate this suit.

This inference is reasonable, and it arises logically from the particularized facts pled with respect to Irvin's historical behavior. I need not rely on it, however, because even if the date of the 2021 Consent is true, it is reasonable to believe that the change in the Managers was made in anticipation of this action, without notice to the Company's members, in order to frustrate the litigation. If so, this type of gamesmanship is inconsistent with equity, which will not require a plaintiff to go to the expense and effort of showing why he did not make a demand on a board of which he was unaware, created to frustrate a derivative action.[159]

---

[158] Compl. ¶¶ 217–80.

[159] Compare the situation here with that in *Smith*, wherein the Plaintiff filed a complaint immediately prior to a publicly announced change in composition of the board of directors. *Smith*, 2016 WL 3223395, at \*2. The *Smith* Court found that the newly appointed board was instead the appropriate board for purposes of assessing demand futility. *Id.* at \*9.

31

The Defendants ask me to look outside the Complaint to exhibits they provide as attachments to their opening and reply briefs. Those exhibits are emails evidencing the 2021 Consent.[160] Exhibit 1 is an email dated January 29, 2021 from Irvin, sent to Lodish, Dunbar, and Clear Align's external counsel, attaching the 2021 Consent.[161] Exhibit 2 is an email by external counsel forwarding the 2021 Consent to counsel representing the Defendants.[162] On a motion to dismiss I am generally constricted to reviewing only the Complaint. But even if I consider these emails here, they imply only that the Board was validly changed in January 2021, prior to the filing of this Complaint. They do not show that the 2021 Consent was in fact circulated to members. The Defendants correctly argue that, as a general matter, a consent is still effective even if prompt notice is not provided.[163] But this Court has, in at least one case, found that failure to provide notice compelled the Court to deviate from the default rule that written consents are effective when executed.[164]

In that case, *Di Loreto v. Tiber Holding Corporation*, majority stockholders executed a written consent making a change to a provision in the pertinent company's certificate of incorporation.[165] That provision was currently being

---

[160] *See* RB at Exs. 1, 2.
[161] *Id.* at Ex. 1.
[162] *Id.* at Ex. 2.
[163] *See Brown v. Kellar*, 2018 WL 6721263 (Del. Ch. Dec. 21, 2018) ("I conclude that Section 228(e)'s notice requirement is not a condition precedent or prerequisite to a corporate action by written consent, but rather an additional obligation resulting from that corporate action.").
[164] *See id.* at *10.
[165] 1999 WL 1261450, at *4 (Del. Ch. June 29, 1999).

litigated between the company and certain minority stockholders,[166] and the company failed to provide prompt notice to the minority stockholders of the edit.[167] The company had also failed to file the amendment promptly with the Delaware Secretary of State.[168] The Court found that "failure to give notice promptly may in certain instances, such as this one, preclude enforcement of the amended provisions—at least until it is filed *and notice is actually given*."[169] The Court then concluded that "an unexplained five-month delay in informing the minority stockholders of [the consent], a period during which the deleted transfer restrictions were themselves the subject of litigation, is not prompt notice within the meaning of Section 228."[170]

The facts before me are similar, but not identical. There was no need to file the updated Board slate with the Delaware Secretary of State. I do not think this distinction saves the Defendants' arguments, however. Here, a five-month delay also inured, during at least some portion of which the Defendants knew that Schoenmann was purporting to bring a derivative action on behalf of the Company. If, perhaps, the Company had immediately provided notice of the Purported Current Board to Schoenmann, equity might be more sympathetic to the Defendants'

---

[166] *Id.* at *2, *3.
[167] *Id.* at *4.
[168] *Id.*
[169] *Id.* (emphasis in original).
[170] *Id.*

arguments. But the record reflects that this case was on file for almost two months before the Company provided notice to Schoenmann that the Original Demand Board had been replaced. The delay in informing Schoenmann of the change is, as in *Di Loreto*, not readily explicable absent gamesmanship.[171] Knowing, as the Company did, that Clear Align was the likely subject of litigation, and that such litigation *was in part derivative*, should have compelled the Managers to provide prompt notice of its change in Board, even if the original notice had been for some reason delayed. The Company's actions here do not comport with equity, even if the 2021 Consent is valid.

I therefore disregard the 2021 Consent in conducting the demand futility analysis, though I do not do so lightly. The facts before me are *sui generis*, and equity at the pleading stage requires that I consider the broader circumstances rather than insisting on the form of the somewhat suspect 2021 Consent.

To establish demand futility, then, Schoenmann must have pled particularized facts demonstrating that either of Bell or Custer lacked independence from Irvin such that he could not impartially consider a demand made that would, in effect, cause

---

[171] Defendants' counsel noted the need for their team to get up to speed after being retained at oral argument, indicating that some delay was only a practical reality of engaging with a new matter. *See* Oral Arg., at 36:18–37:2. I accept this as true. Counsel also argued that the Board had no knowledge that the differences in the Board composition mattered: "[i]t's not like there were three Delaware lawyers on the board that knew this distinction." *Id.* at 39:17–19. Fair enough. But one need not be a lawyer to notice that the Board composition had changed from that challenged in the Complaint and to raise flags with counsel about that inconsistency.

Irvin to become the subject of Company litigation. This Court has noted before the difficulty a director (or here Manager) might face in determining whether to cause a Company to sue a fellow fiduciary.[172]

The allegations the Complaint pleads against Bell and Custer are quite similar. Both managers are compensated by Clear Align for services provided to the Company: Bell as Chief Operating Officer; Custer via a consulting contract.[173] Bell directly reports to Irvin.[174] Irvin has the discretion to remove both or either from the Board at will, as she did with Noteware and Schoenmann.[175] Bell and Custer are alleged to have acted in a way that shows they are aligned with Irvin, although much of this pleading is conclusory or inferential.[176]

I first consider whether Bell can be considered independent. While it is not directly alleged, I can reasonably infer that his position as Chief Operating Officer is his primary employment.[177] I can also reasonably infer that, given Irvin's contractual control of the Company, as well as her history of replacing individuals on the Board of Managers, her status as the majority member, and her status as the

---

[172] *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003).
[173] Compl. ¶¶ 220–21.
[174] *Id.* ¶ 225.
[175] *Id.* ¶ 224.
[176] *See, e.g.*, ¶¶ 227–52.
[177] *See, e.g.*, *Sciabaucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *13 (Del. Ch. July 26, 2018) (quoting *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993)) (inferring that two senior executives with titles CEO and CTO receive their primary employment from the employing entity).

individual to whom Bell directly reports, Bell may in fact be beholden to Irvin, as she is "in a position to exert considerable influence" over him.[178]  The allegations are sufficient to sustain a reasonable inference that Bell is not independent of Irvin. I may infer, therefore, that any demand served by the Plaintiff would have been futile, and Schoenmann's derivative claims may proceed unless they fail to state a claim.  The Defendants challenge only Count 3 on this basis, and I turn to that analysis now.

### 1. The Breach of Contract Cause of Action Fails to State a Claim

Count 3 of the Complaint alleges a derivative breach of contract, particularly Section 6.1(c)(i) of the LLC Agreement.[179]  The Plaintiff reads the pertinent provision to require that, once the Board of Managers was expanded beyond its original size—one Manager, Irvin—the Board must remain upsized and contain two or three managers.[180]  Count 4 also indicates that any action taken by Irvin on behalf of the Board when "there was not a full Board complement" is unauthorized and invalid.[181]

Section 6.1(c)(i) of the LLC Agreement provides:

> (i) The number of Managers shall be one (1) until such time as the Members holding a majority of the Voting Rights determine to increase such number, and such

---

[178] *Id.* (citing *Rales*, 634 A.2d at 937).
[179] Compl. ¶ 295.
[180] *Id.* ¶¶ 295–99.
[181] *Id.* ¶ 299.

> Manager(s) shall be elected (including election following removal, resignation or death) by the affirmative vote of the Members holding a majority of the Voting Rights. Unless so determined otherwise, the Manager shall be Angelique Irvin.[182]

Delaware caselaw requires contracts to be interpreted per their terms; "clear and unambiguous terms are interpreted according to their ordinary and usual meaning."[183] Contract interpretation is a question of law.[184] To interpret contracts, Delaware courts apply an objective theory, construing the contract as would an objective, reasonable third party.[185] The court's analysis is focused "solely on the language of the contract itself. If that language is unambiguous, its plain meaning alone dictates the outcome."[186]

The provision replicated above provides plenary authority to the majority of the members to determine the number and identity of the Board at any time. It does not, moreover, contain any express language supporting the Plaintiff's position that once expanded, Clear Align's Board must remain so expanded. The entirety of the Plaintiff's argument hinges on the word "until"; his answering brief argues that this language is unambiguous and clearly requires the Board remain upsized following

---

[182] LLC Ag., at § 6.1(c).

[183] *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (citation omitted).

[184] *Id.*

[185] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[186] *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008) (quoting *Chambers v. Genesee & Wyo. Inc.*, 2005 WL 2000765, at *5 (Del. Ch. Aug. 11, 2005)).

the original expansion to add Noteware to the Board in 2009.[187] But that is a non-sequitur, to my mind. A statement that the number of the managers shall be one, "until" it is not, does not imply a limitation on the members' ability to return the number to one.

Again, the contractual standard by which the actions of the Defendants must be measured is loyalty (including good faith) and care. At oral argument, the Plaintiff's counsel with respect to this claim "concede[d] it's duplicative—perhaps duplicative of our fiduciary duty claim."[188] Based on this representation, and based on the lack of contractual language supporting the instant Count, I conclude that the separate Count 3 for breach of contract should be dismissed. To the extent the Plaintiff seeks to vindicate the substance of this claim, he has not waived his ability to argue that Irvin's removal of Managers, coupled with any self-dealing activity, was a breach of fiduciary duty arising under Count 4.[189]

\* \* \*

The Defendants' motion to dismiss did not seek dismissal of Count 4 for failure to state a claim. Because I have found that demand was futile, and because it was not challenged under Rule 12(b)(6), Count 4 (for breach of fiduciary duty) survives.

---

[187] AB 31.
[188] Oral Arg., at 32:2–6.
[189] *See id.*

## III. CONCLUSION

The Defendants' motion to dismiss is GRANTED in part and DENIED in part.

For clarity, the motion to dismiss is GRANTED as to Counts 2 and 3 of the Complaint. The motion to dismiss is DENIED as to Counts 1 and 4 of the Complaint.

The parties should submit an appropriate form of order.