# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ATP MARIN, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2023-0415-BWD |
| SENTINEL GLOBAL PARTNERS USA, INC., a Delaware Corporation, | ) ) ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: April 27, 2026
Date Decided: May 7, 2026

Zhun Lu, RIMON P.C., Newark, DE; OF COUNSEL: Akin Alcitepe, RIMON P.C., Washington, D.C.; *Attorneys for Plaintiff/Counterclaim Defendant ATP Marin, Inc.*

J. Jackson Shrum, JACK SHRUM, P.A., Wilmington, DE; *Attorneys for Defendant/Counterclaim Plaintiff Sentinel Global Partners USA, Inc.*

**DAVID, V.C.**

This is an action to quiet title to three yachts that are currently drydocked at a marina in Aydin, Turkey. Prior to August 2016, the yachts were owned by the plaintiff, ATP Marin, Inc. ("ATP" or "Plaintiff"), a Delaware corporation in which a Turkish entity, Koza Ipek Holding, A.S. ("Koza Holding"), owned a 97% interest. Koza Holding, in turn, was owned and controlled by nonparty Hamdi Akin Ipek ("Ipek") and members of his family.

In October 2015, a Turkish criminal court determined that Ipek had laundered money obtained from criminal activities involving a terrorist organization, and appointed trustees to take control of certain affiliated companies, including Koza Holding. In August 2016, Ipek, acting on behalf of ATP, signed bills of sale transferring the yachts to a newly created entity, the defendant here, Sentinel Global Partners USA, Inc. ("Sentinel" or "Defendant").

After a one-day trial, I conclude that the transfer of the yachts to Sentinel was invalid under Section 271 of the Delaware General Corporation Law and must be rescinded. When the transfers occurred, the yachts were ATP's only assets; under Section 271, therefore, approval of ATP's majority owner, Koza Holding, was required to effectuate the sales. The trustees in control of Koza Holding were never notified of, and thus did not approve, the transfer.

1

Equitable rescission provides the appropriate remedy. Returning to the *status quo ante* is feasible because the yachts remain in Turkey within the physical control of the trustees. Judgment is entered for Plaintiff.

## I. BACKGROUND

The following facts are as the Court finds them following a one-day trial held on March 16, 2026.[1]

### A. Koza Holding, Ipek, And ATP

Koza Holding is a Turkish holding company based in Ankara, Turkey.[2] Prior to 2015, Koza Holding was owned and controlled by Ipek and members of his family.[3] Koza Holding owns 97% of the outstanding shares of ATP, a Delaware corporation.[4] Ipek served as a director of Koza Holding until September 2016, and as the sole director and President of ATP until October 2020.[5]

Prior to August 2016, ATP's sole assets were three yachts called "M/Y İpek," "Angel's One," and "Angel's Three" (together, the "Yachts").[6] The Yachts are

---

[1] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __". Dkt. 104. Trial testimony is cited as "Tr. (Witness) at __". Dkt. 123. Joint trial exhibits are cited as "JX __". Dkt. 96. At trial, the parties presented several joint exhibits that were translated into English from Turkish; the accuracy of such translations has not been questioned.

[2] PTO ¶ 4.

[3] Tr. (Sirin) at 12:16–21, 27:11–17.

[4] PTO ¶ 4; JX 13.

[5] PTO ¶ 8; JX 22 [hereinafter Beyaz Dep.] at 47:18–24; JX 23, Resp. 8.

[6] PTO ¶ 6; JX 17 (photographs of the Yachts).

registered in Delaware but are currently drydocked at the Didim Marina in Aydin, Turkey.[7]

**B. A Turkish Criminal Court Appoints Trustees To Govern Koza Holding.**

On October 26, 2015, the 5th Criminal Court of Peace in Ankara, Turkey issued an order decreeing that Ipek and certain of his companies, including Koza Holding, had laundered money obtained from criminal activities involving a terrorist organization.[8]  The order appointed five individuals (the "First Trustees") to serve as trustees for Koza Holding "in order to exercise all the powers of the governing body . . . and to create the new board of directors."[9]  The order directed the First Trustees "to meet immediately after the decision is notified to them by the Chief Public Prosecutor's Office and elect the chairperson of the board of directors."[10]

**C. ATP Transfers The Yachts To Sentinel.**

Ten months later, on August 26, 2016, Ipek, acting on behalf of ATP, signed three bills of sale (the "Bills of Sale")[11] under which ATP purported to sell each of the Yachts to Sentinel, a Delaware corporation formed the day before (the

---

[7] PTO ¶ 6; JX 31, Resp. 8.

[8] JX 1 at 12.

[9] *Id.* at 18.

[10] *Id.*

[11] JX 4.

3

"Transfer").[12] Under each of the Bills of Sale, ATP received $100 plus rights to 80% of all revenue Sentinel earned from chartering the Yacht from the second through the twelfth anniversary of the sale.[13]

## D. SDIF Is Appointed As Trustee For Koza Holding And Later Investigates ATP's Sale Of The Yachts.

On September 6, 2016, the 4th Criminal Court of Peace in Ankara, Turkey issued an order transferring "[t]he powers of the [First Trustees] serving at the companies within Koza-İpek Holding . . . to the Savings Deposit [Insurance Fund]" ("SDIF," and with the First Trustees, the "Trustees"), Turkey's state-run fund established to "protect . . . deposits" and manage financial institutions.[14] SDIF continues to serve as trustee for Koza Holding today.

---

[12] PTO ¶ 5; JX 3. Nonparty Selman Turk founded and initially owned Sentinel. Tr. (Teber) at 85:15–18, 100:24–102:2; JX 20 [hereinafter Turk Dep.] at 13:11–15. Shortly after Sentinel's founding, Turk transferred his shares to nonparty Mehmet Evran, who serves as an officer of Koza Limited, a subsidiary of Koza Holding. Turk Dep. at 15:11–18, 17:14–18:9. In 2020, Evran transferred his interests in Sentinel to nonparty Ozcan Omural. JX 21 [hereinafter Omural Dep.] at 32:1–18. A "certificate of incumbency" dated September 9, 2020 states that Omural is the sole shareholder of Sentinel but owns only 100 of the 3,000 shares authorized under Sentinel's certificate of incorporation. *Contrast* JX 6, *and* JX 7, *with* JX 3, *and* Omural Dep. at 34:7–10. ATP believes that Ipek owns Sentinel's other outstanding shares. *See* Tr. (Teber) at 99:4–100:12; Turk Dep. at 13:16–14:6 (suggesting that Ipek was an 80% stockholder when Sentinel was founded); Omural Dep. at 37:22–38:9.

[13] PTO ¶ 7; JX 4.

[14] JX 2 at 4; *see* Tr. (Sirin) at 9:8–16.

4

On January 20, 2018, Sentinel entered into an agreement (the "Charter Agreement") with nonparty Encore Mining Consultancy Ltd. ("Encore").[15]  Under the Charter Agreement, Encore agreed to "pay all the outstanding costs of the [Yachts]" in return for "80% of all the amounts to be collected" from chartering the Yachts over a ten-year period.[16]

In July 2020, SDIF discovered for the first time that ATP no longer owned the Yachts.  At trial, Koza's current Chief Executive Officer, Abdurrahman Alp Beyaz, testified that it took some time for SDIF to uncover the Transfer because ATP's prior board of directors had "t[aken] all the documents with them . . . [s]o there was nothing in the archive."[17]  After learning of the Transfer, SDIF took steps to replace Ipek as a director of ATP.  Through a joint unanimous written consent, SDIF appointed four new directors and three new officers for ATP.[18]  Throughout the second half of 2020, SDIF and ATP's new board of directors undertook an investigation into ATP's assets and learned that the Yachts had been ATP's sole assets.  SDIF discovered that ATP's bank accounts were empty, and ATP had no

---

[15] JX 9.

[16] *Id.* at 2.

[17] Tr. (Beyaz) at 65:6–11.

[18] JX 13 at 3–4.

trade registrations or records.[19]  During its investigation, SDIF became aware of the Charter Agreement for the first time.[20]  In response, SDIF filed an action in the Turkish courts to establish that the Transfer of the Yachts was fraudulent.[21]

Since the Transfer, the Yachts have remained drydocked at the Didim Marina in Aydin, Turkey.[22]  Koza Holding, under the direction of SDIF, has continued to pay insurance and maintenance costs for the Yachts.[23]

### E.    Procedural History

On April 11, 2023, Plaintiff initiated this action through the filing of a Verified Complaint to Quiet Title and for Cancelation and Unjust Enrichment (the "Complaint"),[24] seeking to quiet title to the Yachts in ATP's favor, an order rescinding the Transfer of the Yachts, and, alternatively, an award of damages on an unjust enrichment theory.[25]  On May 12, Defendant filed an Answer to Verified Complaint with Counterclaims (the "Counterclaims"), asserting a mirror-image request to quiet title to the Yachts in Defendant's favor as well as a counterclaim for

---

[19] Tr. (Beyaz) at 50:10–14.

[20] Tr. (Sirin) at 24:4–10.

[21] JX 15; Tr. (Beyaz) at 50:17–23.

[22] PTO ¶ 9; JX 31, Resp. 8.

[23] Tr. (Sirin) at 18:6–9.

[24] Verified Compl. to Quiet Title and for Cancelation and Unjust Enrichment [hereinafter Compl.], Dkt. 1.

[25] *Id.* ¶¶ 34–52.

breach of fiduciary duty.[26] On May 13, 2024, the Court dismissed Defendant's counterclaim for breach of fiduciary duty. *ATP Marin, Inc. v. Sentinel Global P'rs USA, Inc.*, C.A. No. 2023-0415-BWD (Del. Ch. May 13, 2024) (TRANSCRIPT).[27]

The Court held a one-day trial on March 16, 2026, and the parties submitted post-trial summations on April 27.[28]

## II.    ANALYSIS

The parties assert mirror-image claims seeking to quiet title to the Yachts. Plaintiff argues that the Transfer of the Yachts to Sentinel was invalid under Section 271 of the Delaware General Corporation Law ("DGCL") because ATP's majority stockholder, Koza Holding, did not approve the sale of what amounted to all of ATP's assets. Defendant responds that (1) Plaintiff's challenge to the Transfer is time-barred and (2) Ipek was authorized to transfer ownership of the Yachts.[29] As set out below, Plaintiff's challenge is timely, the Transfer was invalid under Section 271, and rescission of the Transfer is appropriate.

---

[26] Answer to Verified Compl. with Countercl. [hereinafter Countercl.], Dkt. 8.

[27] *See also* PTO ¶¶ 24–32.

[28] Pl. ATP Marin, Inc.'s Post Hr'g Summation [hereinafter Pl.'s Summation], Dkt. 124; Def. Sentinel Global P'rs USA, Inc.'s Post-Trial Summation Rep., Dkt. 125.

[29] Pre-Trial Opening Br. of Def. Sentinel Global P'rs USA, Inc. at 11–12, Dkt. 99.

## A. Plaintiff's Challenge To The Transfer Is Timely.

Defendant's primary contention is that Plaintiff's challenge to the Transfer is time-barred under the applicable statute of limitations. Plaintiff has established that the statute of limitations was equitably tolled and the Trustees were not on inquiry notice of the Transfer until July 2020.

Courts of equity apply statutes of limitations by analogy to determine whether a claim is time-barred under the equitable doctrine of laches. *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 975 (Del. Ch. 2016). Plaintiff's challenge to the Transfer under Section 271 is legal in nature, arising from statute rather than a "traditional equitable right." *See id.* at 984 (explaining that a claim challenging the validity of shares issued in violation of the DGCL was "inherently legal in nature"). Where, as here, a plaintiff asserts a legal claim and seeks equitable relief, the Court "will apply the statute of limitations by analogy, but with at least as much and perhaps more presumptive force given its quasi-legal status, and will bar claims outside the limitations period absent tolling or extraordinary circumstances." *Id.* at 983; *see also Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 788 (Del. Ch. 2014) ("The time fixed by the statute of limitations is deemed to create a presumptive time period in which a plaintiff must bring a claim for purposes of the Court's application of laches, absent unusual or extraordinary circumstances that would make the imposition of the statutory time bar unjust.").

8

The limitations period applicable to claims based on a statute is three years. *See Kraft*, 145 A.3d at 988 ("Under 10 *Del. C.* § 8106, a three-year limitations period applies to actions 'based on a statute.'"); *see also Turner v. Lam Rsch. Corp.*, 2026 WL 788511, at *3 (Del. Ch. Mar. 20, 2026) (explaining that a claim "based on statute" "must be brought within three years of accrual"). Plaintiff's claim based on Section 271 accrued on August 26, 2016, when the Transfer occurred. *Kraft*, 145 A.3d at 989 ("The three-year limitations period created by 10 *Del. C.* § 8106 begins to run from the time of the wrongful act, without regard for whether the plaintiff became aware of the wrongdoing at that time."); *see also ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020) ("Delaware is an 'occurrence rule' jurisdiction, meaning a cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.'" (citation omitted)). Plaintiff waited until April 11, 2023—almost seven years later—to file this lawsuit. Plaintiff's claim is therefore time-barred unless the statute of limitations was tolled.

"Under these circumstances, [Plaintiff] bears the burden of showing that one of the tolling doctrines adopted by Delaware courts applies[] and that [its] claims, therefore, were still timely when filed." *Vichi*, 85 A.3d at 788. Plaintiff contends,

among other arguments, that the limitations period was equitably tolled.[30]  "Under the theory of equitable tolling, the statute of limitations is tolled . . . where a plaintiff reasonably relies on the competence and good faith of a fiduciary."  *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).  The doctrine reinforces the idea that "even an attentive and diligent investor may rely, in complete propriety, upon the good faith of fiduciaries."  *Id.*; *see also Kahn v. Seaboard Corp.*, 625 A.2d 269, 276 (Del. Ch. 1993).  Equitable tolling delays the limitations period only until "the plaintiff is objectively aware of the facts giving rise to the wrong, *i.e.* on inquiry notice."  *Weiss*, 948 A.2d at 451.  Inquiry notice arises when "persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury."  *MKE Hldgs. Ltd. v. Schwartz*, 2020 WL 467937, at *12 (Del. Ch. Jan. 29, 2020) (emphasis omitted).

As a director and officer of ATP, Ipek owed fiduciary duties to ATP and its stockholders, including Koza Holding.  *See Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1208–09 (Del. Ch. 2010).  Ipek approved the Transfer on behalf of ATP while its 97% stockholder, Koza Holding, was under the control of the First Trustees.[31]

---

[30] Plaintiff also contends that the limitations period was tolled under the discovery rule. Pl.'s Pretrial Opening Br. at 12–13, Dkt. 97.  Because equitable tolling applies, the Court does not address this alternative argument.

[31] JX 1 at 14.

10

The Trustees were "entitled to rely upon the competence and good faith of those protecting [their] interests." *Weiss*, 948 A.2d at 452. But the trial record shows that rather than seeking the First Trustees' approval for the Transfer, Ipek failed to disclose the transaction to them.

The record confirms that the Trustees were not on inquiry notice of the Transfer before July 2020. As Plaintiff points out, the Transfer "left no meaningful outward commercial footprint" because "[t]he [Y]achts were never commercially operated" and "[t]here was therefore no revenue stream, no outward pattern of operations, and no market-facing conduct that would have put [the Trustees] . . . on notice that [ATP's] principal assets had been transferred away."[32] ATP never provided the Trustees with records of the Transfer, including the Bills of Sale.[33] ATP's principals failed to turn over any corporate records to the Trustees.[34] It was only through the Trustees' later investigation that they learned in July 2020 that the Yachts were ATP's sole assets and were purportedly transferred without stockholder

---

[32] Pl.'s Summation at 13–14.

[33] Tr. (Beyaz) at 65:1–2 ("[T]he board of ATP Marin w[as] not informing Koza [in] any[] way[.]"); *id.* at 65:6–11 (testifying that ATP's prior fiduciaries "took all the documents with them . . . [s]o there was nothing in the archive" when SDIF assumed control).

[34] *Id.* at 50:12–14.

approval.[35] Defendant has not identified any facts that should have put the Trustees on inquiry notice of the Transfer before that time.

As a result, the statute of limitations was equitably tolled until July 2020, making Plaintiff's claim timely.

**B.    The Transfer Constituted A Sale Of Substantially All Of ATP's Assets In Violation Of Section 271.**

Section 271(a) of the DGCL requires majority stockholder approval to authorize the sale of all or substantially all of a corporation's assets:

> ***Every corporation may*** at any meeting of its board of directors or governing body ***sell***, lease or exchange ***all or substantially all of its property and assets***, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, ***as its board of directors*** or governing body ***deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock*** of the corporation entitled to vote thereon . . . at a meeting duly called upon at least 20 days' notice.

8 *Del. C.* § 271(a) (emphasis added).

The trial record shows that at the time of the Transfer, the Yachts were ATP's only assets, such that Ipek sold all of ATP's assets through the Transfer.[36]  Under

---

[35] *Id.* at 50:10–14.

[36] *See* Tr. (Beyaz) at 53:13–14 (testifying that ATP "ha[d] only three assets, which are these yachts"); *id.* at 50:3–14 (explaining that the Trustees reviewed bank records, accounts,

Section 271, therefore, the Transfer could not be accomplished without the authorization of Koza Holding, then controlled by the First Trustees. The record evidence confirms that the First Trustees were not informed of, and did not authorize, the Transfer.[37]

Defendant does not point to any record evidence showing, or even argue, that ATP owned other assets at the time of the Transfer or that the First Trustees approved the Transfer. Instead, Defendant argues that the Transfer did not constitute a sale, lease, or exchange under Section 271.[38] This argument is belied by the Bills of Sale, under which ATP plainly agreed to "*sell*[], transfer[], convey[], assign[] and deliver[] to [Sentinel] title and interest" to the Yachts.[39]

To summarize, the trial record reflects that the Transfer constituted a sale of all of ATP's assets, requiring majority stockholder approval. Because ATP did not

---

assets, and other records and determined that the Yachts were ATP's sole assets); Tr. (Sirin) at 23:12–15 ("After the second half of 2020, there was a search and investigation[] about the assets of ATP, and other than the yachts, we did not find any other assets."). The trial record is devoid of any evidence that ATP owned other assets at the time of the Transfer.

[37] Tr. (Beyaz) at 71:19–72:3 (testifying that if the First Trustees had approved the Transfer, "there would be some sort of permission paper, approval or notification related to this sale[,]" "[b]ut there are no such [records] in the archive"); Tr. (Sirin) at 20:11–20 (testifying that the Trustees never received documentation seeking approval of the Transfer).

[38] Def.'s Pre-Trial Answering Br. at 10, Dkt. 101.

[39] JX 4 (emphasis added).

obtain approval from its 97% stockholder, Koza Holding, the Transfer is invalid under Section 271.  Having so found, I turn to the appropriate remedy.

## C.    Rescission Is The Appropriate Remedy.

ATP seeks an order equitably rescinding the statutorily invalid Transfer.  An order of rescission "restore[s] the parties substantially to the position which they occupied before making [a] contract." *Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Mar. 1, 1984).  "Rescission is a remedy designed to end (rescind) legal relations created by valid or voidable contracts, and can be sought at law or in equity." *In re Tesla, Inc. Deriv. Litig.*, 2025 WL 3689114, at *11 (Del. Dec. 19, 2025). "[E]quitable rescission offers a platform to provide . . . equitable relief, such as cancellation of a valid instrument—the formal annulment or setting aside of an instrument or obligation." *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *21 (Del. Ch. Mar. 21, 2018).

"The court has broad discretion to award [rescission] where the facts and circumstances warrant." *Kuramo Cap. Mgmt., LLC v. Seruma*, 2024 WL 1888216, at *42 (Del. Ch. Apr. 30, 2024).  A plaintiff must show that rescission is both "reasonable and appropriate," and that it is possible "for all parties to the transaction [to] be restored to the *status quo ante*, *i.e.*, to the position they occupied before the challenged transaction." *Id.* at *43 (citations omitted).

14

Equitable rescission is the appropriate remedy here. Returning the parties to the *status quo ante* is relatively straightforward because the Yachts subject to the Transfer remain in Turkey within the physical control of the Trustees, and Koza Holding (under the direction of the Trustees) has continued to pay insurance and maintenance costs for the Yachts. The Bills of Sale that effectuated the Transfer will be rescinded; Plaintiff must return the consideration received from Defendant under the Bills of Sale, and title to the Yachts will revert to Plaintiff.

## III. CONCLUSION

Judgment is entered for Plaintiff. The parties are directed to meet and confer on a proposed form of final order to implement this decision.